T. J. WRIGHT, RESPONDENT, v. KANSAS CITY STRUCTURAL STEEL COMPANY, A CORPORATION, APPELLANT.—157 S. W. (2d) 582.

Kansas City Court of Appeals.   December 1, 1941.

Leo T. Schwartz and Maurice J. O'Sullivan for appellant.

Philip M. Wilson and O. H. Stevens of Counsel.

*Trusty, Pugh, Green & Trusty, N. R. Fischer* and *Guy Green* for respondent.

BOYER, C.—This is an appeal, duly perfected, from a judgment for $5000 rendered in favor of plaintiff on account of personal injuries alleged to have been received through the negligence of defendant, and while plaintiff was engaged as an employee of another

company. Errors assigned pertain chiefly to the ruling of the court on a demurrer to the evidence, and in the giving and refusal of instructions. The main instruction authorizing recovery is assailed for the principal reason that it failed to require a finding of essential elements and that plaintiff failed to establish the essential elements of a submissible case.

Plaintiff was injured while engaged in construction work on the municipal water plant in Kansas City, Kansas. The plant was being reconstructed in part and extended. A portion of the work included the building of large coal hoppers. The Patti Construction Company was the general contractor. The Kansas City Structural Steel Company was a subcontractor to do certain steel, iron and structural work, including the steel work on the hoppers. The Gunite Construction Company was another subcontractor to do the work of lining the steel hoppers with reinforced concrete. For brevity, these companies will be referred to hereafter as the Patti Company, the Steel Company, and the Gunite Company.

Plaintiff, at the time of his injury, was an employee of the Gunite Company whose foreman on the job was Harry Miller. The Steel Company's foreman was named Murl Miller, and Charles Chaney was assistant superintendent for the Steel Company. Guy G. Manlove was superintendent for the Patti Company.

The work of the Steel Company on the hoppers necessarily preceded that of the Gunite Company. Four adjoining hoppers were constructed in a row. They are described as forming rectangular funnels. The outside was covered with riveted sheets of steel. They were designed to receive coal from a conveyor belt above them and to feed the furnaces below through a chute extending from the bottom of the hoppers. The Steel Company had completed its work on the hoppers some weeks before the accident, but a crew of men had returned and was engaged in removing and rebuilding what is called a bridge to support the conveyor belt above the hoppers. The accident happened in what is designated in evidence as hopper No. 2. In this hopper a beam extends across it about six or seven feet from the south side and about five or six feet below the top of the hopper. The south side of this hopper was sloping all the way from the top to the bottom. There was a 2x10 or 2x12 board with one end resting on the beam and the south end resting upon and tied on the ramp or side of the hopper and within a foot or a foot and a half of the west wall. Plaintiff and a co-worker for the Gunite Company were standing on this board taking measurements when it broke and let them fall. This board had been placed in position by one of the Steel Company's men during the time of its work, and this board together with other interior boards on each side of the hopper were used by the steel men during the course of their work. When the steel men finished, the board in question was not removed. The work of the steel men on

the hoppers had been completed several weeks before the Gunite men came on the job to do their part of the work. In the meantime, according to defendant's evidence not controverted, the general contractor was to do all clean up work and remove all rubbish and other things in the hoppers preparatory for the work of the Gunite Company. The board in question was not removed from hopper No. 2 when the Gunite Company took charge. Plaintiff and his co-worker were ordered by their foreman to get into the hopper in question and take meansurements without procuring their own scaffolding which had been used in an adjoining hopper.

To test the ruling on the demurrer a rather detailed statement of the testimony of plaintiff's witnesses and of the evidence favorable to plaintiff is required. An understanding of the evidence relied upon by plaintiff will be assisted by a statement of plaintiff's theory of the case made by his counsel in their brief as follows:

"Plaintiff's petition pleaded and his recovery instruction submitted the theory that defendant, a subcontractor, building hoppers and other steel work connected therewith, at the Kansas City, Kansas municipal water plant, selected and put into a hopper which it was constructing a board for a walkway; that it was a regular custom for employees of one contractor to use a walkway so placed for such purpose by employees of another contractor or subcontractor; that the custom was known to defendant, and it knew it would likely be used by others and it and *its foreman intended and expected employees of the subcontractor for whom plaintiff was working to use the board under such custom,* and that under the same or similar circumstances a reasonable and careful person situated as defendant would use ordinary care to have a reasonably safe board for the use to be reasonably expected or would remove it or forbid its use; and the board was partly sawed in two and not reasonably safe, and that plaintiff, pursuant to such custom and at the invitation of defendant, went upon it for his employer and it broke and that defendant failed to exercise ordinary care by reason of the facts, and that such failure directly caused plaintiff's injuries, because the defective board broke in two and caused him to fall below."

Plaintiff testified that he went to work for the Gunite Company about August 5. The work of lining one of the hoppers had been completed prior to Monday morning, August 9. He described the process of lining the hoppers with wire mesh tied to rods which were fastened to clips on the metal surface. This was to receive a coat of concrete, to be applied in a spraying process according to the Gunite system, which would form the lining for the hopper and prevent the coal from corroding or otherwise injuring the metal part of the hopper. When the Gunite Company went on the job it took its own boards and scaffolding material which were used in its work on the first hopper. Plaintiff stated that they were to start on hopper No.

2, Monday morning; that he did not know whether others had been working in there before or not; that he had nothing to do with putting the board in place; that it was there and he had seen the steel men and Patti's men use it; that his foreman, Harry Miller, told him "to jump in there and get these measurements;" before he went to work he heard his co-worker, George Boring, ask Murl Miller, one of the Steel Company's foremen, if he was going to use that scaffolding or tear the scaffold out; that he did not hear the answer; he was a little hard of hearing. Plaintiff then stated: "When I started to go where the other scaffold was in the other hopper, they hollered to me to come back, that they were going to use that scaffold." It was either Boring or Harry Miller, his foreman, who called to him. He was then ordered to get in the hopper and he and Boring climbed over the west side of the hopper and down on the board in question. They were working there, taking measurements, when the board broke. The board was a 2x10, about eight feet long and spanned a space of six or seven feet. After the board broke he observed a saw cut in it nearly half way through.

On cross-examination, the following questions and answers appear:

"Q. Harry Miller was your foreman, and he then told you to jump down in there, in the hopper, which would be hopper No. 2, and to get those measurements? A. Yes, sir.

"Q. And that is the reason you went down in the hopper at the time? A. Yes, sir.

"Q. Because your foreman told you to hop down and get the measurements? A. Yes, sir.

"Q. And that is the reason you were on the board at the time? A. Yes, sir.

"Q. And, without that order, of course, you would not have been there? A. No, sir, I would not.

"Q. You would have gone and got your own scaffold, and brought it back and put it in place? A. Yes, sir. .

"Q. And at the time this thing happened nobody else was in or around the board except you and Mr. Boring—you and Mr. Boring were the only men around the board at that time? A. Yes, sir."

George Boring testified that he had been working on the job about two days before the accident; that the rod and mesh work had been completed on the adjoining hopper; that he was with plaintiff on the board when it broke, taking measurements for his boss, Harry Miller, who had told him to work there; he had noticed that there was a scaffold in there; that he had a conversation with Murl Miller, foreman for the Steel Company, about the scaffold or board, and said: "To the best of my knowledge, I asked him if he was going to jerk that scaffold out and could we—that is as far as I got, and he said, 'Go ahead and use it. We will probably need it ourselves.'" He did not see anyone else on the board; there were scaffold boards below

that they fell on; the board that broke was about 2x10; after the fall he was dazed and did not look at the board. He further said it seemed like there was mesh in there, but he was not sure. After the conversation with Murl Miller, his own foreman, Harry Miller, ''told us to measure the distance between those struts, and give him the measurements so he could cut the rods.'' He said: ''Get down in there. I don't know whether he said jump in, but he said get down in there.''

Harry Miller testified that he was the boss in charge of a small force of men, including plaintiff and Boring, who were engaged in lining the hoppers with rods and mesh, a part of the work which was to be done by the Gunite Company; that he made the arrangements to employ the plaintiff; that plaintiff and Boring were doing the lining work inside the hoppers; that the work on one hopper had been completed in so far as his work was concerned; that they had nothing to do with applying the concrete; that was to be done by another craft; that the Gunite Company sent a load of scaffolding over when they were ready to begin; that they put their own scaffolding in the hopper which had been completed. In reference to hopper No. 2, where the accident happened, and in answer to a question as to whether he had given any instructions to any of his men to put in scaffolding or boards of any kind in that hopper, he said: ''No, sir; there was enough scaffolding in there for me to do what work I wanted to do in this hopper, and to reach the lower side without putting any scaffolding in there.'' The board that broke was not one of the Gunite boards; he knew it was there and that one end of it was tied to the ramp or side of the hopper; he was not sure whether he had used it himself or not, and was not sure whether a part of the wire matting had already been installed. He said that he made no inspection of the board; that all of his men were subject to his orders; that he sent plaintiff and Boring in to get measurements; that he ordered both of the men in and said: ''I told them, I said, go over there, and in there, and get me some measurements on those struts.'' There was a four-way scaffolding resting on the ramps of the hopper, five or six feet below the beam. He had his own scaffolding and three-quarter inch line to hang boards and a small short board in the other hopper; he did not hear any conversation between Boring and Murl Miller; he denied making a previous statement that his own crew had put the board that broke in the hopper. The Steel Company men were working at the time on the bridge.

The testimony of Ralph Hankins was presented in the form of a deposition which was read. He testified that he was employed by the Steel Company at the time of the accident and was working on the conveyor bridge above the hoppers and had previously been engaged in installing the steel portion of the hoppers; that the work on the hoppers had been completed and all that belonged to the Steel Com-

pany was taken out of the hoppers three or four weeks before the accident. In reference to the board which broke with plaintiff, this witness testified that while at work on the hopper he procured and installed that board himself just to walk on; that he obtained it from the material of the Patti Company, and in placing it where it was he tied the south end of it with a rope belonging to the Steel Company; that there was no further work of the Steel Company to do in the hopper, but the board was left in because it was needed to go down and back when he recovered articles that he dropped while working on the bridge above, and that he had so used it; that the Gunite men had been working about a week before the plaintiff was injured, and that the hopper in which plaintiff fell had been lined with mesh up to about ten feet from the top; that Murl Miller and others were engaged in the steel work for the Steel Company; that Harry Miller was a boss for the Gunite crew; that he had seen Harry Miller, George Boring, and plaintiff use the board while taking measurements in the hopper for their wire; the board had been in use two months; after it broke he observed a saw cut two and one-half or three inches deep on one side and about three feet from the south end where it hit the hopper.

On cross-examination, he further testified that ''we had finished in the hopper;'' that he saw Murl Miller use the board also; that it was a 2x10 or 2x12; that all it was put there for was to walk on; that he put the board there for his own use; that there was a single board scaffold around on the inside when the men fell. Part of his testimony from a previous deposition was read to the jury, in which he stated that he was in Murl Miller's gang changing the bridge at the time of the accident; that he had been on the job about three months; and when asked how long he had seen the Gunite men use the board, he said: ''Oh, they used it a week before they got on top of the hopper. They used to go down in the bottom and put this mesh on the bottom of the hopper. They used it for the same purpose we used it.'' . . . ''I didn't know who was going to use it. We put it in there for our own use for that matter;'' so far as he could determine there was nothing wrong with the board; ''I didn't know there was a thing wrong with it.''

Several witnesses testified that it was the general custom and practice for employees of one subcontractor to use scaffolding placed by other subcontractors who were engaged in work on the same project. This evidence was received over the objection of defendant.

Plaintiff's counsel admitted that plaintiff had been paid for compensation and medical aid the total sum of $2983.53 by the insurer of plaintiff's employer under the workmen's compensation law of Missouri.

A number of witnesses were called by defendant. Charles Chaney testified that he was employed as assistant superintendent for the

Steel Company and was the superintendent in charge of the company's work at the water plant in Kansas City, Kansas, at and before the time of the accident and was on the job at the time; that the Steel Company men had been off the job quite awhile and had come back and had been back a few days and were working on the conveyor bridge over the hoppers; that the steel work on the hoppers had been completed probably four or six weeks before, and at the time there was no further work of the Steel Company to do around the hoppers or in them; he thought that some of the work the steel men had to do was right over the hopper where the accident occurred; he had noticed the Gunite men working there and was pretty sure that they moved their scaffold out of one hopper and into another; that they were doing some of it that morning, and "some fellow started to hand a board over there about half cut in two, and I told him someone was going to get themselves busted on that board, and I went on about my business;" that he had nothing to do with the Gunite men in their work; that the Steel Company hadn't had anything in the hopper for a month or six weeks; "we had some plank up above these hoppers, laid across the top of them, and we had our scaffolding on that;" he had no supervision over the Gunite men, and the Steel Company at that time had no occasion or business for having any scaffolding or boards inside of the hopper; he was in general charge of the work being done by the Steel Company; and he said that he hadn't seen Mr. Hankins going down inside the hopper.

On cross-examination he said that if a man dropped anything in the hopper he would have to go down after it; he didn't know whether that had occurred; he didn't know who the man was that was handling the defective board; that the man was working there and he was passing this board over the wall into the hopper; there was a saw cut in it and he cautioned the man that it had better not be used; the man did not say anything, and the witness did not know what was done with it; that "when a craft or contractor has a scaffold made, if anybody else wants to step on it, to get on it and do a little work on it, it is permissible;" that the Gunite men were moving scaffolding, but he didn't know just when they started or stopped and didn't pay much attention because it was not any concern of his; he judged that Harry Miller was foreman for the Gunite Company the way he was acting, but didn't know that he was an iron worker at the time. The witness explained the work on the overhead track. The Patti Company was the general contractor and its superintendent would see that all sub-contractor foremen did their work in proper time to make the job function as it should; and that the clean up work was all done by the general contractor.

Guy G. Manlove testified that he was superintendent for the Patti Company from July 1 until the completion of the job; that he was on the job when plaintiff was injured and heard about it, but did not

witness it; the Patti Company was the general contractor; the Steel Company was a subcontractor; and in reference to whether the Steel Company had separate contracts for different parts of its work, witness said: "No, I think it was all included in the contract so far as the structural steel and hoppers were concerned." The Steel Company finished its work on the hoppers the latter part of July or the first of August when they got the gates on the bottoms of the hoppers; they were doing no further work on the hoppers at the time of the accident; after the Steel Company had finished the construction of the steel part of the hoppers "we had our men to clean them out, and prepare them for the Gunite Company to line the hoppers." This was about the first of August; "I was supposed to have them ready for the Gunite people the first of August, but they came in a little late. I would say it was either the last week in July or the first week of August. We had to remove the mortar, rubbish, or anything, or planks, that might be in the hoppers, to get them out of the way, and it is customary and we try to turn them over in shape and where they can work." The Patti Company men "clean out the mortar and stuff, if it was our material and remove any scraps or frames that might be in there." There was no other crew doing any work on the hoppers while the Gunite Company was doing its work. At the time the men were hurt the Gunite Company had possession of the hoppers for the purpose of doing their work; no one else had any occasion to do any work in the hoppers while the Gunite men were doing their work.

On cross-examination, he admitted that it was the custom and practice for employees of one subcontractor to make use of scaffolding and boards found lying around, or placed at a certain point to be used and traveled over by employees of other contractors; and that he didn't see any of his men take anything out of that hopper.

Murl Miller testified that he was employed by the Steel Company and did work in connection with the construction of the hoppers; that he helped build the hopper in question; that the main part of the job was finished and they were off probably six weeks, something like that, and then came back to do a little job of work on the hoppers; the steel work on the hoppers was completed about six weeks before the accident happened; at the time the men were hurt, he was working on the conveyor over the hoppers, practically right over them, taking out the old bridge and putting in a new one; he saw them falling and went and helped get them out; the conveyor was two or three feet above the hopper; one of the men was holding to a piece of iron; the other had fallen farther down; witness did not know how much mesh was in the hopper, but said that he remembered walking over some of it in taking one of the men from the bottom, but he didn't know how far; he looked at the broken board and as well as he remembered "it had been sawed in on one side, probably three or

three and one-half inches, or something like that, and it broke about two or three feet from the south end, where it was tied on to the line.'' He was foreman for the Steel Company at the time and had a crew of about four men. He denied having any conversation with Mr. Boring prior to the accident in reference to the scaffold such as Boring testified to, or with anyone else, about scaffolding in the hopper. He said: ''We didn't have nothing down there at all—we finished down there in the hopper and had been for some time.'' He didn't notice the board before and didn't remember that he was ever on it; witness Hankins was working there at the time under his supervision, and he didn't remember that Hankins dropped anything at any time off the scaffold above down into the hopper and went down after it; he didn't order any boards put down for men to get back and forth in case they dropped anything; they could walk down on the sloping side of the hopper.

Victor Hunter and Charles Baxter were both employed by the Steel Company at the time of the accident and were working on the overhead conveyor. Mr. Hunter testified that he saw the men fall and that they fell on the mesh below; that he assisted in getting them out and held onto the mesh while climbing out. Mr. Baxter testified that the steel work on the hoppers had been finished and that they returned to work in a month or six weeks; that they had 2x10 planks in the hopper and he did not know whether they were removed; there was no further work for them to do on the side of the hopper; that the wire matting had already been placed in the hopper in question pretty well up to the top; that he helped the men out and walked up on the matting; and that the steel men at that time had no occasion to use the board.

Supplemented by the medical and other testimony relating to the extent of plaintiff's injuries, the foregoing is in effect the substance of the evidence which would have any bearing on the questions to be decided. Further reference may be made to the evidence when deemed proper in the course of the opinion.

Respondent urges that appellant's statement is not clear and concise or a fair statement of the facts favorable to plaintiff, is argumentative, and is insufficient to meet the requirements of Rule 16 of this court. It is urged that for this alleged failure the appeal should be dismissed. Upon examination, we have found that appellant's statement and its brief are amply sufficient to inform the court of the material facts of the case and the points intended to be insisted on in argument for a reversal of the judgment, and that appellant has substantially complied with the requirements of Rule 16, as well as the requirements of the applicable statute, Section 1226, Revised Statutes Missouri 1939.

The briefs of counsel on both sides are of unusual volume. They elaborate not only upon the points and authorities claimed to be de-

cisive, and cases in support thereof, but indulge in prolonged diversions for a consideration of foreign and domestic cases said to be analogous to the one in hand, and refer to principles of law declared in various jurisdictions. They also contain prolonged arguments as to what the facts are, and the effect of the facts, and what the proven facts establish relative to the rights of plaintiff and the duty of defendant and plaintiff's employer, and whether or not plaintiff established a submissible case. The position of the parties in reference to the principles of law applicable to the case is equally adverse.

Among the multitude of questions that are argued, two are given special prominence. One is the question of control or right of control of the hopper and its contents, including the defective board, at the time of plaintiff's injury; and the other question is whose negligence was the efficient and proximate cause of plaintiff's injury.

Appellant contends that under the facts defendant had finished its work on the hopper in question, surrendered possession to the general contractor, and that plaintiff's employer, the Gunite Company, took possession and was in control at the time of the accident and had been for some days before; that it adopted the board in question without inspection and appropriated it to its own use instead of using its own scaffolding, and ordered and directed plaintiff to use the board; that this constituted a break in the chain of causal connection between the alleged negligence of defendant and plaintiff's injury; and that the negligence of plaintiff's employer was the efficient and proximate cause of the injury.

Respondent insists that defendant's control was continuous; that it merely suspended work on the hopper for some period of time and then returned for the completion of other work on the conveyor; that all of defendant's work was under one contract and there had been no cessation of control of the hopper until after plaintiff's injury; that defendant was liable independent of control because of the prevailing custom, and because it expected, intended and invited the plaintiff to use the board in question, and under such circumstances the defendant's negligence was the proximate cause of the injury.

The conclusion has been reached that appellant is right upon these contentions and that its position must be sustained. The law of Kansas, declared by the Supreme Court of that State, when applied to the facts requires the conclusion stated. ''The cause of action arises in Kansas. . . . By comity we hear and determine such actions, but the Kansas law is the applicable law, and the existence of the right to recover must be measured by the law of our sister State and not by our laws. . . .'' [Woodard v. Bush, 282 Mo. 163, 173, 220 S. W. 839, 1. c. 841.]

In submitting the case, the court refused defendant's instructions on the issues of control and proximate cause The recovery instruction given by the court followed the line of plaintiff's theory set out

above and authorized the jury to find that defendant's negligence "directly caused the plaintiff to fall into said hopper" and "that he was injured as a direct result thereof."

On the question of possession and control, respondent argues that "according to plaintiff's evidence, the Gunite men had no reason to be in this particular hopper *until the day of the accident. . . . Gunite had nothing to do with the board or hopper until the morning of the injury.*" These statements were italicized as here written. They attract attention because they are in direct conflict with the proof offered by plaintiff and the allegations of the petition. Plaintiff's witness, Hankins, said there was no further work for the Steel Company to do in the hopper, and that the hopper at the time plaintiff fell had been lined with mesh up to about ten feet of the top. No one denied this, and other witnesses confirmed the fact that the hopper was already lined to a considerable extent. This was the work of the Gunite Company alone. The petition alleges that defendant knew that Gunite Company employees were likely to use the scaffold and board, "and knew that for several days the employees of the Gunite Construction Company were using said board and said scaffold." In addition to the foregoing, the positive and uncontroverted testimony of defendant's witnesses shows that the Gunite Company took possession for the purpose of doing its work. The testimony of plaintiff's witnesses and the physical facts in reference to the condition of the hopper on the day of the accident conclusively show that the Gunite Company had previously lined a portion of the hopper. How this could have been done without possession and control of the hopper must be left to pure conjecture. The contention of respondent that defendant still exercised control and right of control is without substantial support. The testimony of witness Hankins that he did on occasion continue to use the board to recover fallen articles, together with his other testimony, does not afford any substantial basis for a finding that defendant was in control. No permissible presumption or inference that defendant was in control could arise from this testimony in the light of other proof offered by the plaintiff. The question of who was in possession and control at the time of plaintiff's injury should be considered definitely settled as appellant contends.

While the law of Kansas controls the substantive rights of the parties the law of the forum, which is the law of Missouri, covers the *quantum* of proof necessary to establish a case. The rule of substantial proof prevails; a mere glimmer or scintilla of evidence is insufficient. [Transamerican Freight Lines v. Marcrome Art Marble Co., 150 S. W. (2d) 547. 551, and cases cited.]

Preliminary to a consideration of the question of the proximate cause of the injury it is appropriate to consider the relationship of the parties, their respective rights and duties, and the law of master and servant. In Kansas, as elsewhere, the primary duty to furnish

a safe place to work and safe instrumentalities rests upon the employer. This duty is absolute and nonassignable, as the Supreme Court of Kansas declared in the case of Allison v. Stivers, 81 Kan. 713, 106 Pac. 996. In this case an employee was directed by his foreman to do certain carpenter work close by a scaffold built by brick masons. The employee commenced to build a scaffold of his own to enable him to reach the place. He was using a ladder for his purpose when his foreman came along and ordered him to take the ladder down and get upon the old scaffold to nail the necessary timbers and get the work done. The order was obeyed and while the employee was on the scaffold engaged in his work, it fell and injured the worker. The foreman did not superintend the building of the brick masons' scaffold and was ignorant of its condition. The facts and the reasoning of the case are so apt as to justify the following quotation:

"This is the ordinary case of a master who provides his employees with an unsafe instrumentality with which to prosecute the work. The brick masons' scaffold took the place of the ladder. In the exercise of his own discretion the appellee chose the ladder as the proper implement with which to build his own scaffold. Acting upon his own initiative, he was bound to know whether the work could be safely accomplished by means of the ladder, and hether the one he himself selected was fit for use. But he was not allowed to proceed according to his own judgment, select his own materials, supply his own instrumentalities and make his own place as the conduct of the enterprise required. The master, through the foreman, interfered, took away the ladder and gave the appellee the brick masons' scaffold instead. The appellee had no discretion in the matter. He did not select or use the scaffold relying upon the care and prudence of the brick masons in building it. The master selected it and ordered it to be used, just as he might have purchased another ladder, brought it upon the scene and ordered the appellee to substitute it for the one he was using when the foreman appeared. In such a case the duty would rest upon the master to supply a ladder which was reasonably safe, and he would be bound to know whether it was reasonably safe before ordering an employee ignorant of its condition to climb upon it. The discharge of this duty would not depend upon who constructed the ladder. Whether made by a manufacturer of ladders, by an ordinary carpenter, or by brick masons or their helpers, the master's duty would be the same. So here. The master took the scaffold as he found it, adopted it as his own, supplied it to the appellee and ordered him to use it instead of the ladder. It is immaterial that the scaffold was built by the brick masons, and immaterial that the master did not superintend its erection. He imposed it upon the appellee and was obliged to know whether it was reasonably fit for service."

By a substitution of names the above could be adopted in its entirety as descriptive of the situation in the case at bar. When plaintiff used the board in question he did not rely upon the care of defendant. He and his co-worker were not permitted to obtain their own scaffolding and install it, but were ordered by their foreman to use the scaffolding already installed. Plaintiff's foreman adopted and substituted the scaffolding already erected, without inspecting the board, and ordered plaintiff to use it. Plaintiff got upon the board and used it relying upon the care of his own employer and because he was ordered to do so. According to his own statement, he would not have been upon the board and would not have used it except for the order of his foreman.

Respondent's counsel claim that plaintiff was expressly invited by the defendant to use the board and intended it to be so used. Plaintiff does not say so, and the evidence does not show it. Neither plaintiff nor his foreman were aware of any conversation which Boring related "to the best of his knowledge." If Boring's statement of what occurred between him and the defendant's foreman be accepted, it constituted a permit rather than an invitation, and whatever it was, neither plaintiff nor plaintiff's foreman knew anything about it and they were not influenced by it in the least. Independent of the right of control of the hopper and board, there can be no doubt that defendant had no right of control over plaintiff's foreman. We have failed to find anything in the evidence, or in the law under the evidence, that would justify the shifting of responsibility for plaintiff's injury from the shoulders of his own employer to the shoulders of defendant. To do so would be equivalent to the transfer of the duty of plaintiff's employer to defendant, and to require defendant to respond in damages for the neglect of a duty devolving upon another. Such a vicarious doctrine is not good law, and is not the law of Kansas.

On the question of proximate cause the law is equally clear. The negligence of plaintiff's employer, through its foreman, was the immediate, direct, efficient and proximate cause of the damage to plaintiff. Even though defendant may be said to have been negligent through its employees in selecting a defective board for use, such negligence was remote from the negligence of the Gunite Company at the time of plaintiff's injury and was not the direct cause under the facts in this case. There was an intervening and final cause which was immediate and direct in its effect. There may be two or more independent acts of negligence in a line of causation, separated by periods of time. But when the last act of negligence is the efficient and producing cause of a given result, it is none other than the direct and proximate cause. The causal connection between the original negligent act and the injury is broken by the intervention of the last efficient negligent act. This is the reasoning of the Supreme Court of Kansas. A full exposition of the law upon the subject is contained

in the following cases: Railroad Co. v. Justice, 80 Kan. 10, 101 Pac. 469; McCallion v. Railway Co., 74 Kan. 785, 88 Pac. 50; M. K. & T. Ry. Co. v. Merrill, 65 Kan. 436, 70 Pac. 358; A. T. & S. F. Ry. Co. v. Penfold, 57 Kan. 148, 45 Pac. 574; Bailey v. Kelly, 93 Kan. 723, 145 Pac. 556; Colwell v. Parker, 81 Kan. 295, 105 Pac. 524; Smith v. Mead Const. Co., 129 Kan. 229, 233, 282 Pac. 708.

Many other cases, both State and Federal, are cited as supporting the Kansas ruling. It is unnecessary to refer to them. The only question is whether or not the law as announced in the above cases applies to the case in hand. We are of opinion that it does, and that under the ruling so made there was no causal connection between the alleged negligence of the defendant and the injury to plaintiff under the facts and circumstances in this case.

Plaintiff cannot rest his case upon custom and usage of the building trade. His use of the board was not induced by custom, but by the direct order of his foreman. Moreover, the rules of law cannot be subverted in that way. The reason and the authorities therefor are fully shown in Clark v. Allaman, 71 Kan. 206, 232, et seq., 80 Pac. 571. Upon careful consideration of the above authorities there is no escape from the conclusion that plaintiff failed to establish a submissible case and that the demurrer should have been sustained.

Respondent's counsel contend that the rules and principles announced in the cited cases do not apply, and seek to distinguish them from other cases upon which they rely.

The case of Mastin v. Levagood, 47 Kan. 36, and certain New York cases are claimed to be in point. It is argued that the New York rule was approved in the Mastin case and that this conclusively shows that the law of Kansas is the same as that of New York, under which liability attaches to one originally negligent even though there are intervening negligent acts. The Mastin case is not in point, and the later Kansas cases very definitely reject the New York rule.

Cole v. Shell Petroleum Co., 149 Kan. 25, was an action for damages occasioned by overflow of water. In the treatment of the case the court clearly recognizes the doctrine of an intervening efficient cause making the injury its own, and there is no ruling in conflict with the cases cited above.

Early v. Burt, 134 Kan. 445, was an action for damages against a contractor who had laid a sewer in a city. He had cut the pavement and failed to properly fill the excavation and keep it reasonably safe until the pavement was replaced. It appears that he undertook to do this. It was held that under the circumstances the failure of the city to maintain its street in a safe condition did not relieve the defendant from liability where his negligence was the efficient cause of the injury.

Neiswender v. Shawnee County Commissioners, 151 Kan. 574, was an action to recover damages on account of the defective condition of

a county bridge. The injured person, driving in an automobile, collided with another car on the bridge, was thrown through a defective bridge railing, and was drowned. The question of proximate cause was submitted to the jury under an instruction that "if there was no danger existing to Robert Neiswander because of the defective condition of the bridge except for the collision referred to, . . . then such defective condition of the bridge would not be said to be the proximate cause of his death." The jury found for the commissioners and the court granted a new trial on the ground that it had submitted the case upon the wrong theory of law. The judgment was affirmed, and the opinion at page 576 recites:

"The theory of the instruction as given was that only one, and not both, of the events or circumstances involved could be the proximate cause of the death. When more than one act or event takes place, either of which might in itself have resulted in death or injury, and the two acts or events are in no way related, but are merely successive, many cases hold that only one can be said to be the proximate cause. But that is not the situation here. The collision and the condition of the railing were directly related in the accident."

It is to be observed that the last two cases involved an obstruction and a defect in public highways, and the breach of duty was one owing to the public. They are clearly distinguishable from master and servant cases, and there is ample reason for the rule that one causing a danger on highways dedicated to public use should remain liable until the danger is removed.

A large number of additional cases and authorities are submitted for consideration, many of which sustain various and sundry propositions and announce legal principles, but none of which are controlling upon the questions here ruled. Further reference to them is unnecessary in view of the conclusion reached. During the trial, the case at bar was fully explored and completely developed as shown by a record of 566 pages. It has not been made to appear that defendant is legally liable for plaintiff's injury. The judgment should be reversed. The Commissioner so recommends. *Sperry, C.,* concurs.

PER CURIAM:—The foregoing opinion of Boyer, C., is adopted as the opinion of the court. The judgment is reversed. All concur.