William DUKE, Appellant,

v.

MISSOURI PACIFIC RAILROAD COM-
PANY, a Corporation, Respondent.

No. 45654.

Supreme Court of Missouri,
Division No. 2.

June 10, 1957.

Motion for Rehearing or to Transfer to Court
en Banc Denied July 8, 1957.

Harris & Dubinsky and Cleo V. Barnhart, St. Louis, for appellant.

Harold L. Harvey, Marvin Boisseau, Jr., and Don B. Sommers, St. Louis, for respondent.

BOHLING, Commissioner.

William Duke sued the Missouri Pacific Railroad Company, a corporation, for $250,000 damages for personal injuries. The court sustained defendant's motion for a directed verdict at the close of plaintiff's evidence on the theory an intervening efficient cause was the proximate cause of plaintiff's injuries. Plaintiff prosecutes this appeal.

In August, 1953, the City of St. Louis was rebuilding the Morganford bridge over defendant's double tracks, which are in a cut at that point. The John Kalicak Construction Company, Inc., was the general contractor, and the Henry Farber Painting Company was sub-contractor for the painting. At conferences between Roscoe Nelson, a Civil Engineer in the Department of Public Service supervising the construction for the city, Harold Kalicak, of the Construction Company, and officials of the defendant arrangements were made for defendant to place a flagman at the scene, whose duties were to see that the right-of-way, surface and overhead, was clear, and if not clear to stop the trains, or, if clear, give the go-ahead signal for the train to proceed under slow-order at 5 miles an hour. It was not the duty of the flagman to clear the tracks or take care of the materials for any of the construction men, including the painters.

Adolph Dewing, foreman, Clarence Mierzejewski and plaintiff were the employees on the job of the Henry Farber Painting Company. They were not employees of defendant. The three employees of the Painting Company assembled a 20′ painting stage or scaffold on August 11th, raised it a foot off of the ground, and tested it by jumping up and down on the platform. The stage was suspended over the tracks from a horizontal 3′ I-beam of the bridge, with top and bottom flanges of about 1′. The stage platform was about 5′ below the top of the beam when in position for painting. A 3′ firewall hook at each end of the stage passed over the I-beam. At the lower end of each hook was a block and tackle, through which a ¾″ Manila rope passed with one end attached to a stirrup. The stirrups were triangular pieces of metal, and the base of a stirrup supported the stage platform at each end. The other end of the rope, used in raising and lowering the stage, is known as a "fall." It hung down from the block and tackle. It is customary practice for the fall to extend down to the ground. The stage is made secure when suspended by a taking a "half-hitch" in the fall, we understand, at the block that goes into the firewall I-hook. The fall at each end of the stage was in good shape, the north fall being new rope. There was also a life line, a rope with knots tied in it fastened to an anchor and reaching down to the ground, from which workers on the stage could swing if anything happened.

About 11:30 a. m. August 11th, the stage was over the defendant's tracks with the north fall down in the center of defendant's north track when a passenger train approached over said track. The south fall was down in the vicinity of defendant's south track. Plaintiff, on the stage, watched the train. He estimated its speed at 10 to 15 m. p. h. Defendant's flagman, Anthony Steffen, took the north fall to the south, between the two tracks, that the train might pass. The engine and several cars of the train passed without incident. However, a switch engine approached over

the south track from the opposite direction. The flagman released the north fall and started "working" his flag toward the switch engine. This permitted the north fall (rope) to fall against the side of the train and catch between the passenger cars. Plaintiff stated it caught between the cars about six times, would stretch, jerk loose, and cause the ends of the stage to bang against the I-beam. This heavy strain caused a piece of the rope to break or be cut off and part of it to become frayed. Dewing cut off the frayed portion and threw it to the side. The south fall was not damaged.

When the train caught the rope plaintiff pulled himself on top of the I-beam and was not injured by the occurrence.

Harold Kalicak, Sr., whose company had the general contract, came out to the work. Plaintiff, being asked, told Kalicak what had happened and that he was not going back on the stage to work. Kalicak told plaintiff to paint what he could from the ground and after that plaintiff worked on the ground. He knew the stage was not safe, and did not get back on it. Later in the afternoon Mr. Farber came out. Plaintiff told him what had happened and Mr. Farber "raised hell" about letting the rope get damaged. He directed that the ropes be coiled and put over the I-beam. Plaintiff did this. The stage was not used any more.

On August 13, 1953, Henry Farber directed plaintiff to take the stage down after the 11:30 train; stating "you know how"; and that the other men would help. He did not give plaintiff any specific directions. Plaintiff proceeded in the customary manner. Dewing and Mierzejewski took positions on the ground to man the fall ropes; Dewing at the south fall and Mierzejewski at the north fall. Plaintiff lowered himself onto the stage to untie the half-hitches and intended to pull himself back on the I-beam after untying the half-hitches. Plaintiff first untied the south half-hitch. When he did so Dewing let his fall slip and the south end of the stage slipped down a little, a few feet. Plaintiff told Dewing to hold it. Dewing answered he had it. Plaintiff then walked up the incline, asking Mierzejewski for a little slack, and untied the half-hitch on the north fall. Mierzejewski then automatically lowered his end of the stage to level it. The stage was then too low for plaintiff to reach up and pull himself back onto the I-beam as he and his co-workers originally intended he should do. Plaintiff's co-workers lowered the stage a few feet. The weakened north fall then broke and plaintiff fell to the ground and was severely injured. It is for the injuries thus sustained that he seeks damages.

Plaintiff testified to the following effect: It is the duty of painters using a stage to make sure it is safe before getting on it. He was the most experienced stage man on the job and was the only one using the stage for painting. He had been on the job ten days and knew trains operated over the tracks. The north fall was hanging down on the track on August 11th. It was his, plaintiff's, "duty to see that those falls did not get injured." He saw the train catch and jerk the north fall. He knew the force of the train was a much greater force than the stage exerted on the rope and as a result there was probably some weakening of that rope, that it was not safe to get back on the stage, and that the reason the stage was being taken down on August 13th was because it was unfit for use. He got back on the stage because of the order of Mr. Farber, his employer, to take it down. No one from defendant told him to get back on it. No test whatever of the strength of the north fall was made after the train struck it. With sufficient help the stage could have been lowered with absolute safety without anyone getting on it, but three men could not do this. When they took the stage down the life line was coiled up on top of the I-beam and was not being used. Plaintiff saw no need to use the life line, stating you only use it when you are actually using the stage, not when you are letting it down.

The testimony was that after Dewing let the south fall slip, plaintiff could have had him level the stage by the south fall without putting any additional strain on the north fall; and then plaintiff could have untied the north fall and climbed back onto the I-beam. This was not done.

Plaintiff stated it was no fault of anyone connected with defendant that he got in a position where he could not climb back onto the I-beam or that he was not using the life line at the time. He and his witnesses testified that defendant had nothing to do with the repairing of the Morganford bridge, the erection or use of the stage, the manner in which the painters performed their work, or the lowering of the stage on August 13th, which was the duty of the Painting Company.

■ While plaintiff is entitled to the most favorable view of the established facts and inferences in support of his claim upon a motion for a directed verdict at the close of plaintiff's case, the review is not limited to isolated facts but embraces a consideration of the whole of the evidence adduced on behalf of plaintiff and conceded facts are not to be disregarded. Walter v. Alt, 348 Mo. 53, 152 S.W.2d 135, 142 [7–9] and cases cited: Young v. City of Farmington, Mo., 196 S.W.2d 124, 126 [1]; People's Finance Corp. v. Buckner, 344 Mo. 347, 126 S.W.2d 301, 302 [3].

■ Plaintiff invokes the rule of respondeat superior, also expressed in another Latin maxim: "Qui facit per alium facit per se." O'Brien v. Rindskopf, 334 Mo. 1233, 70 S.W.2d 1085, 1088. He states that, while the flagman was not required to personally remove any obstruction from the tracks, the flagman's act in moving the north fall that the train might pass was for his employer's benefit and in furtherance of his employer's business, and his employer, defendant, is liable although the flagman selected a wrong or negligent method therefor, or exceeded his authority or violated specific orders of his mas-

ter in doing so. Linam v. Murphy, 360 Mo. 1140, 232 S.W.2d 937, 942; Porter v. Thompson, 357 Mo. 31, 206 S.W.2d 509, 511 [2]; Simmons v. Kroger Grocery & B. Co., 340 Mo. 1118, 104 S.W. 2d 357, 359. However, the instant case is not the ordinary situation presented when a third person seeks damages from an employer or principal for the negligent act of an employee or agent. It has unusual aspects, among others: Defendant had no control or right of control over the repair of the bridge, or the materials used or the men performing the work. Plaintiff had been on the job for ten days and knew trains passed over the tracks. He testified that the fall was hanging down on the track; that it was his, plaintiff's "duty to see that those falls did not get injured"; and that the flagman "agreed to hold that fall." Plaintiff's performance of his duty would have precluded the flagman performing it for him. There was no conflict between the interests of plaintiff and defendant in the flagman's act on August 11th of clearing the track of the fall for the train to pass; and, in furthering the interests of his employer, the flagman at the same time was furthering the interests of plaintiff by discharging a duty resting, according to plaintiff, primarily upon plaintiff. In these circumstances the logic of the situation is that any fault to be imputed to defendant arising out of the acts of the flagman on August 11th is likewise a fault to be imputed to plaintiff. Cf. Wallen v. Mississippi R. & B. T. R. Co., Mo.App., 267 S.W. 12, 13 [1]; Johnson v. Atchison, T. & S. F. R. Co., 117 Mo.App. 308, 310, 311, 93 S.W. 866.

Defendant had no right to repair the rope or to remove the stage from the bridge. It was the duty of the Painting Company to repair its damaged rope and to control the removal of its stage. Plaintiff knew the stage was being removed because it was unfit for use. Plaintiff did not rely upon any care of the defendant and defendant had no control over the removal of the stage. Plaintiff and his co-workers

assumed the responsibility of its removal under their employer's order. Plaintiff got back on the stage on August 13th, with knowledge it was unfit for use, because of the order of his employer or because he was the "stage man," and not by reason of any order of defendant. With additional help the stage could have been lowered by ropes without danger to anyone. Plaintiff could have climbed back onto the I-beam, as he and his co-workers intended, if his co-workers had not negligently allowed the stage to slip to a position where he could not do so. And, after the south end had slipped, Dewing could have leveled the stage with the south fall without placing any additional strain on the damaged north fall, and plaintiff could have climbed back on the I-beam after he untied the north fall. Plaintiff concedes his co-workers were negligent. Plaintiff's employer owed the duty of protecting plaintiff.

■ This is a typical case for the application of the doctrine of an intervening efficient cause, making the act of defendant in law the remote cause.

■ "Where a second actor has or should have become aware of the existence of a potential danger created by the negligence of an original tort-feasor, and thereafter, by an independent act of negligence, brings about an accident, the first tort-feasor is relieved of liability, because the condition created by him was merely a circumstance of the accident and not its proximate cause." 65 C.J.S. Negligence § 111 b, notes 44, 45, p. 692.

"A prior and remote cause cannot be made the basis of an action if such remote cause did nothing more than furnish the condition or give rise to the occasion by which the injury was made possible, if there intervened between such prior or remote cause and the injury a distinct, successive, unrelated, and efficient cause of the injury, even though the injury would not have occurred but for such condition or occasion. If no danger existed in the condi-

tion except because of the independent cause, such condition was not the proximate cause; and, if an independent negligent act or defective condition sets into operation the circumstances which result in injury because of the prior defective condition, such subsequent act or condition is the proximate cause." 65 C.J.S. Negligence § 111 d, p. 693.

Smith v. Mabrey, 348 Mo. 644, 154 S.W. 2d 770, 772, was an action against Mabrey and a city by a child, who, when confronted with a walk having mud and puddles of water on it, started to cross the street to reach a better walk and was struck by Mabrey's automobile while doing so. The court assuming, without holding, the walk was not maintained by the city in a reasonably safe condition, considered such negligence was only incidental and had no direct connection with the automobile striking plaintiff. See also Branstetter v. Gerdeman, 364 Mo. 1230, 274 S.W.2d 240, 246.

In DeMoss v. Kansas City Rys. Co., 296 Mo. 526, 246 S.W. 566, it was assumed that defendant's motorman was negligent in starting forward quickly at a street intersection and moving into the path of an automobile in which plaintiff was a guest. The street was wet and slippery, and the automobile, when the brakes were applied, skidded and a collision followed. The evidence was that if the automobile had not skidded it would have stopped. It was considered that under ordinary conditions the automobile reasonably should have been expected to stop or turn and avoid the collision; and that an intervening efficient cause, over which defendant had no control and which the motorman had no reason to anticipate, was the proximate cause of the collision. Madden v. Red Line Service, Inc., Mo. App., 76 S.W.2d 435, is to like effect.

In Wright v. Kansas City Structural Steel Co., 236 Mo.App. 872, 157 S.W.2d 582, 591 [7–9], plaintiff, the employee of a sub-contractor, sued a prime contractor for injuries sustained through the use of a defective board left in a scaffold, which was

not removed when the prime contractor completed its part of the work. Plaintiff was using the board because he was ordered to do so by his foreman, who had not inspected it, and was relying upon the care of his own employer and not the care of defendant. The negligence of plaintiff's employer was held to be the proximate cause of the damage to plaintiff. The case arose under the Kansas law; but the court considered a vicarious doctrine holding the prime contractor in such circumstances responsible for the neglect of a duty owed plaintiff by his employer not good law.

■ The problem of causal relation is one of fact, depending on the facts of the individual case. Dickerson v. St. Louis Pub. Serv. Co., Mo., 286 S.W.2d 820, 825 [9, 10], a case stressed by plaintiff, is distinguishable on the facts, and we do not understand it to hold an original tort-feasor liable for any and all damages following his act regardless of what facts may intervene between his negligence and the injury. It was a passenger-carrier case, involving the highest degree of care. Defendant's bus operator had stopped at a "Bus Stop" sign, but 10 to 11½′ out from the curb in the lane of moving traffic on a busy city street when he could have pulled into the curb. The operator opened the door for passengers to alight, and while plaintiff was on the top step in the act of alighting the bus was struck violently from behind by a truck, knocked several feet straight ahead, and plaintiff was thrown into the street and injured. The negligence of defendant's motorman under the common law and under an ordinance requiring the stopping of vehicles near the curb had not ceased but was continuous and active up to the time of impact. The court so held. The negligence of the bus operator and of the truck operator were concurring acts of negligence.

■ Intervening is used in a time sense. It refers to later events. In the instant case defendant's negligence had ceased to be active, had become passive. It caused no injury. The resulting danger was known. Plaintiff's employer owed the duty to plaintiff of repairing the rope or providing a safe means for lowering the stage. Defendant had no control or right of control in connection therewith. Had plaintiff's employer properly performed this duty no injury would have resulted. Plaintiff was on the stage by reason of his employer's order. Plaintiff's employer in the performance of his duty committed an active overt negligent act, which reasonably should not have occurred, and plaintiff concedes active negligence imputable to plaintiff's employer caused plaintiff's injuries. This occurred after defendant's negligence had become passive.

Briefly of other cases cited by plaintiff. Creech v. Riss & Co., Mo., 285 S.W.2d 554, 561, involved a negligent act injuring plaintiff's knee and the court held that there was sufficient evidence to submit to the jury whether plaintiff's fall several months later was a proximate consequence of the original negligence and injury. The instant plaintiff was not injured on August 11th. An intervening efficient cause in the sense here involved was not ruled in the Creech case, nor do we find it ruled in Votrain v. Illinois Term. R. Co., Mo., 268 S.W.2d 838, 843 [4]; Conner v. City of Nevada, 188 Mo. 148, 86 S.W. 256, 260(4); Kimberling v. Wabash R. Co., 337 Mo. 702, 85 S.W.2d 736, 740, 741 [6]. In some of plaintiff's cases no wrongful act of a third person was involved. In other cases, as we read them, the defendant breached a duty of a continuing nature and his negligence was active at the time of plaintiff's injury, it not having come to rest. The Dickerson case, supra; Gaines v. Property Servicing Co., Mo., 276 S.W.2d 169, 173; Berry v. Emery, Bird, Thayer D. G. Co., 357 Mo. 808, 211 S.W.2d 35, 41, 42; Domitz v. Springfield Bottlers, Inc., 359 Mo. 412, 221 S.W.2d 831, 832; Dodson v. Maddox, 359 Mo. 742, 223 S.W.2d 434, 439; State ex rel. City of St. Charles v. Haid, 325 Mo. 107, 28 S.W.2d 97, 100, approving Cregger v. City of St. Charles, 224 Mo.App. 232, 11 S.W.2d 750,

753; Floyd v. St. Louis Pub. Serv. Co., Mo., 280 S.W.2d 74, 78; Hogan v. Fleming, 317 Mo. 524, 297 S.W. 404, 409 [4]; Chicago G. W. R. Co. v. Mackie, 8 Cir., 60 F.2d 384 and cases there cited.

We do not take up defendant's additional contention that plaintiff assumed the risk of injury.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion of BOHLING, C., is adopted as the opinion of the court.

All concur.