**S. A. McTURMAN, Plaintiff-Appellant,**

v.

**Ervin BELL, Defendant-Respondent.**

No. 8486.

Springfield Court of Appeals.

Missouri.

Dec. 31, 1965.

Briney, Welborn & Spain, Joe Welborn, James E. Spain, Bloomfield, for plaintiff-appellant.

Finch, Finch, Knehans & Cochrane, Jack O. Knehans, Cape Girardeau, for defendant-respondent.

RUARK, Judge.

S. A. McTurman suffered injuries when his fingers were caught in a sheave.[1] He sued and submitted on the theory that Ervin Bell, his employer, had failed to furnish him a safe place to work. Defendant offered no evidence but stood on his motion for judgment. A jury awarded plaintiff five thousand dollars. The court sustained defendant's motion to set aside and for judgment in accordance with the previous motion, and plaintiff has appealed.

 On appeal the verdict-holder is entitled to benefit of all favorable evidence and inferences therefrom. However, a review of the evidence is not limited to isolated facts but embraces a consideration of all the evidence adduced by the plaintiff. Duke v. Missouri Pacific Railroad Co., Mo., 303 S.W.2d 613(1), and cases cited. Since there is some conflict in plaintiff's case, we must relate the facts in detail.

Plaintiff, fifty-eight years old, a self-styled farmer, had ten or more years' ex-

1. As we understand it, a sheave is the wheel in the block and tackle arrangement whereby heavy articles are lifted or pulled. Simplified, the sheave is a pulley wheel over which runs the cable that bears the weight.

perience "off and on" in the logging business. He had done logging for various persons and had engaged "many times" in the operation of loading logs on trucks, unloading them, and loading them on sawmill ramps. He had used and was familiar with the use of sheaves, cables, chains, block and tackle, and teams as standard and customary equipment and operation in the logging business. Defendant Bell was a neighbor, but his business and experience are not shown. He had some logs down in a field, and he employed plaintiff to help "snake them out" and haul them to the mill. They had been hauling the logs to a custom sawmill operated by brothers Monroe and John Stevens, who were charging Bell twenty dollars per thousand for sawing his logs into lumber. Apparently the Stevens brothers also did their own logging and sawed lumber for themselves, because on an occasion shortly previous to the one here involved when Bell (and possibly plaintiff) had brought in a load of logs there was no room for them on the unloading ramp or skid.[2] According to plaintiff's witness Monroe Stevens, "we had *our* logs on the skid and we had to throw them [he evidently meant customer Bell's] logs on the ground. * * *" "Well you see there wasn't room on the ramp for them and we had to just throw them out on the yard." He said, "One load was throwed off right north of the ramp, and the others [the three logs with which we are involved] was around kind of northwest of the shed."

On the morning of the accident, Bell and plaintiff went down to the field and loaded some logs on the truck. According to plaintiff's testimony, as they started to the mill Bell said, "When we unload this load we'll load them other logs on where I can get them two by fours cut where I can start my shed." When they got to the mill they unloaded onto the ramp. Then, according to Monroe Stevens (one of the two sawmill operators), "he was in a hurry for them

heavy timbers, and I told him if he would back his truck around there [by the pile of logs in the yard] me and my brother would load them with our team and bring them around there to the front and put them on the ramp where we could saw them and try to get his timbers ready for them." Accordingly, Bell backed his truck around beside (south of) the logs which had been thrown on the ground northwest of the shed. John Stevens brought his team around, skids were placed against the side of the truck, chains were fastened to the logs, a cable was attached, and the horses pulled the first two logs up on the truck. Up to this point there is not much conflict. The loading operation was being conducted by the Stevens brothers. John was on the south side of the truck with the team, and Monroe was on the north side with the logs. Bell and plaintiff were there with Monroe; and, although neither was requested to do so (or to perform any other act in connection with the loading operation), they (Bell and plaintiff) helped Monroe put chains around the logs prior to the loading.

A third log was larger and heavier, and the horses had difficulty pulling it up the skids. Then the Stevens brothers got their block and tackle (or sheave and cable), which gave them "double horsepower." One end (on pulley?) was attached to a willow tree *somewhere* near a fence and south of the truck. (The Stevens brothers say *they* attached it, but plaintiff says *he* attached it although not requested to do so.) The horses were hitched to the cable or pulley (plaintiff insists that he held the doubletree for this), and the horses then pulled the log up the skids; but when they had the log up the side almost ready to roll on the truck, the horses reached the fence, could go no farther, and backed up a step. According to plaintiff's witness Monroe Stevens, "one more little pull and it would have been upon it." "But the cable wouldn't go no

2. The ramp was a sort of platform arrangement extending along the east side of the shed so that logs could be unloaded and rolled down to the saw carrier.

farther on account of the fence, if they could they would have pulled the log on, it would get right up to the edge of the truck and they didn't have room to put it on top of it." According to this witness, he, plaintiff, and Bell were still on the north side of the truck with the logs. When the horses got to the wire and started to back up, plaintiff said, " 'I'll run around and help him,' and he was gone, just like that." Plaintiff went around on the south side of the truck. "He [evidently meaning John Stevens] pulled the log up again and they [evidently meaning the team] couldn't go far enough, and when he backed up I heard him [evidently meaning the plaintiff] holler, the team started backing up and my brother pulled them up again to get his hand out, and then we let the log back down on the ground." Plaintiff's witness, *John* Stevens, said that he was handling the team on the south, that the others, including the plaintiff, were on the north side. The horses got to the end of the fence "as far as they could go. I told them they'd have to let it back and fix it different, and he run around I guess and put his hand on that, grabbed the cable." He (plaintiff) was then on the south side of the truck "where he shouldn't have been." When plaintiff hollered, Stevens drove the horses forward again so that plaintiff could release his hand from the pulley wheel. Plaintiff testified that he was on the south side of the truck during the entire time after Stevens' block and tackle was brought out and held up the doubletree while John Stevens hooked to the cable. And then "he started up the horses and I stepped back. The next thing I knowed my hand was in that cable and that's as far as I knowed about it." He said he hollered for John to pull the horses up and John did pull them up, and "I got my hand out of the pulley." He said the cable was over waist high; and he "imagined" that he was about two feet from the cable while the horses were pulling it. He could give no explanation as to *how* his right hand got onto or was caught in the cable. There was no evidence that the cable swung, jumped, whipped, or otherwise misbehaved. The Stevens brothers

were handling the loading operation. No one told plaintiff to do anything to help in the operation, but he did so. After plaintiff got his fingers out of the pulley wheel, Bell took him to a doctor; and the Stevens brothers went ahead and finished the loading while they were gone.

■ As we have stated, appellant's submission was on negligence of his employer in failing to furnish a safe place to work— this, we gather, because there was insufficient room to handle the loading operation; and this in turn because a fence, or at least the end of the fence, blocked the path of the horses, thus requiring them to stop their forward pull and causing them to step backward while there was still the weight of the log, and consequently a reverse pull, on the opposite end of the cable. We shall attempt to describe the premises. The sawmill shed ran north and south. The loading ramp was along the east side. *Somewhere* on the west side of the shed a sawdust trough ran out to the west to a branch; along this trough ran the fence which blocked the further progress of the horses. The evidence does not show whether this trough and fence ran due west, southwest, or northwest. Neither do we know the length of the sawmill shed or the distance from the shed to the end of the fence where the horses stopped and stepped backward, nor whether there was room to go around the end of the fence. The logs to be loaded and presumably the truck parked beside them were northwest of the shed, but we are unable to find *how far* north and how far west. The whole record does not give any idea whatsoever of the distance from the loading operation at the truck to the end of the fence where the horses stopped.

For the purpose of this opinion, we will assume—without, however, deciding—that when plaintiff suffered his injury he was then acting in the capacity as an employee of respondent. We believe the plaintiff did not make a submissible case for several reasons.

First, in regard to whether the injury resulted from an unsafe place: The employer is not an insurer of the safety of his employees. Liability can result only from a failure to perform a duty owed. 35 Am.Jur., Master and Servant § 121, p. 549; Russell v. St. Louis & S. F. Ry. Co., Mo. App., 245 S.W. 590(1); West's Missouri Digest, Master and Servant ☞101(2). And if the injury could have resulted from two or more inconsistent and equally inferable causes, and one is as probable as the other, and if the defendant is liable for one cause and not for the other then a finding that it resulted from either one must necessarily be based on conjecture and plaintiff's case must fail.[3]

In this case we are unable to determine whether the incident was the result of an unsafe place (in the location of the truck by the logs and the nearness of the fence which may have been the cause of lack of room for the loading operation), or whether it really resulted because of the *method* used by John Stevens in driving his team. Was the distance from the truck to the end of the fence where the horses stopped the shortest or the longest distance for their operation? If the horses had been headed a little to the left or to the right, would there have been adequate room? It must be remembered that the log was almost on the truck and the added distance required for "one more little pull" to roll it onto the truck was small. Did John Stevens, by sending the team on the most direct and shortest route to the end of the fence, necessarily shorten the distance available for the pull which was reasonably available by the heading of the team at an angle, or possibly around the end of the fence? Another question: The evidence does not show the length of the hook-up between the horses and the log. Was the distance the cable ran out from the log and through the pulley to the doubletree five feet? Ten feet? Twenty feet? Thirty feet? Or farther? How much, if any, space or distance was wasted there? The evidence does not show. The short or long coupling would make considerable difference in the distance which the horses must travel out from the load to the place where they stopped only a foot or two short of the necessary distance. The longer the hook-up, the shorter space available for the pull. The Stevenses did go ahead and load the log while Bell was taking plaintiff to the doctor. They obviously had to work in this same space. How they changed their method is not shown. We think that deficiency in method on the first try is equally inferable with deficiency in place.

Second: If we assume that the place was unsafe for the operation because of the location of the objects and the lack of room, we are of the opinion that the respondent is not to be charged with liability therefor.

As a general rule the master is not liable for injuries due to defects in the place of work which is furnished by and is under the control of the third person and over which the master has no actual or implied control or appropriate use; especially is this true when he does not actually direct the work.[4] The cases cited by the appellant are those in which the master had, or exercised, some dominance over the place of work. The duty of the master in this respect is substantially the same as that of an owner or occupier to a business invitee. 56 C.J.S. Master and Servant § 219, pp. 929, 930. The basis of such liability is really superior knowledge and ability to rectify and the duty to guard against injury from

3. Coin v. John H. Talga Lounge Co., 222 Mo. 488, 121 S.W. 1(6), 25 L.R.A.,N.S., 1179, 17 Ann.Cas. 888; Osterhaus v. Gladstone Hotel Corp., Mo., 344 S.W.2d 91(5); Kane v. Chicago, Burlington & Quincy Railroad Co., Mo., 271 S.W.2d 518(2); Clymer v. Tennison, Mo.App., 384 S.W.2d 829(6).

4. 56 C.J.S. Master and Servant § 210, p. 918; Small v. Ralston-Purina, Mo.App., 202 S.W.2d 533(4); Allen v. Larabee Flour Mills Corp., 328 Mo. 226, 40 S.W. 2d 597(5); Nichols v. Skelly Oil Co., 175 F.2d 113, 115 (8th Cir.).

hidden dangers. Fowler v. Terminal Railroad Association of St. Louis, Mo.App., 372 S.W.2d 497. Hence, the liability in respect to safe place to work usually does not apply when the conditions are as obvious to the invitee (or) servant as they are to the owner (or) master. 65 C.J.S. Negligence § 50, pp. 541, 543; Small v. Ralston Purina Co., Mo.App., 202 S.W.2d 533(3); Capobianco v. Yacovelli Restaurant, Inc., Mo.App., 360 S.W.2d 302; Kenward v. Hultz, Mo.App., 371 S.W.2d 344(6).

Thus, where the things used in the work are not, in and of themselves, defective and are of the equivalent character and safety of those customarily used in that type of activity, where the servant is familiar with the work and has opportunity to inspect the premises and the appliances for himself and thus stands on equal footing with the employer in regard to knowledge, and where there are no hidden dangers, then the master is not ordinarily liable for an injury of the servant which results from a voluntary act of the servant in the use or misuse of such. See Newhouse v. St. Louis Bank Building & Equipment Co., 326 Mo. 1047, 33 S.W.2d 932; Britt v. Crebo, Mo., 199 S.W. 154; Hollingsworth v. National Biscuit Co., 114 Mo.App. 20, 88 S.W. 1118; Whitaker v. Terminal R. Ass'n of St. Louis, Mo.App., 224 S.W.2d 606, 609. Here the plaintiff by reason of his knowledge and experience was at least the equal of the defendant in knowledge of the conditions, and he was not required by the employer to do anything whatsoever.

Ordinarily the duty to provide a safe place is not so strictly applied where the particular place of employment is not fixed and the risk involved therein is a transitory danger incident to the employment, where the risk arises out of some single or separate occurrence in the moving and shifting activities with which the employee is familiar, and where the master has had no superior opportunity to know and guard against the particular danger.[5]

We are of the opinion that (a) the respondent owed no duty of "safe place," because he did not have control either of the place or of the operation; but (b) if it could be said that he did have control, the risk involved was a transitory one incident to the work and as well understood by the appellant as by the respondent.

Third: We believe the act of appellant in sticking his hand on the cable in front of the pulley was a separate, independent, and intervening cause of his injury.

Where the employer only creates a condition which in and of itself and in the ordinary course is not a hazard and will not in and of itself cause injury, and the employee, having equal knowledge with the employer, intervenes with a distinct and separate act which he can reasonably foresee will combine with the condition to cause injury, and such intervening act is not at the direction of the employer and is not one reasonably to be expected of the employee in the normal course of his employment, then the original condition is only a remote cause and the act of the employee in intervening so as to cause the injury becomes the efficient proximate cause.[6] The plaintiff was at least as familiar with the conditions and probable result of his own act as was

---

5. Redmond v. Quincy, O. & K. C. R. Co., 225 Mo. 721, 126 S.W. 159; Bennett v. Crystal Carbonate Lime Co., 146 Mo.App. 565, 124 S.W. 608, 610–611; Highfill v. City of Independence, Mo., 189 S.W. 801, 803; Zeigenmeyer v. Charles Goatz Lime & Cement Co., 113 Mo.App. 330, 88 S.W. 139(1); Meehan v. St. Louis, M. & S. E. R. Co., 114 Mo.App. 396, 90 S.W. 102; Stone v. Mo. Pac. Ry. Co., Mo., 293 S.W. 367, 370; Pritchard v. Thompson, 348 Mo. 832, 156 S.W.2d 652.

6. 35 Am.Jur., Master and Servant, § 126, p. 555; 65 C.J.S. Negligence § 111, pp. 685, 692; Clymer v. Tennison, Mo.App., 384 S.W.2d 829(9, 10); Duke v. Mo. Pac. Railroad Co., Mo., 303 S.W.2d 613(4); King v. Ellis, Mo., 359 S.W.2d 685(4); Branstetter v. Gerdeman, 364 Mo. 1230, 274 S.W.2d 240, 246; see Labatt's Master and Servant, Vol. 3, § 1048(147), p. 276.

the defendant. Wilburn v. Southwestern Bell Telephone Co., Mo.App., 382 S.W.2d 49, and cases at 55. Strictly speaking, the plaintiff was injured as the direct result of his own "incurred risk." Dye v. Peterson, Mo.App., 350 S.W.2d 272, 275.

The appellant offers no reason why he put his hand up on the back-running cable which carried his fingers into the pulley wheel. He does not contend that such (ill-advised or unintentional) action was ordered or that it was a part of the normal, expected, or ordinary procedure in an operation of this kind. He does not contend this conduct was consistent with the procedures which attended the loading of logs. Nothing caused him to stumble or be thrown into the cable, and there is no evidence that the tackle or cable misbehaved in any manner. It "just happened." If his theory of recovery can be sustained, then no employer would ever be safe in sending his employee on an errand onto any business property. See 35 Am.Jur., Master and Servant, § 174, p. 603. We can only repeat that the employer was not an insurer and is not liable for appellant's misfortune. So far we have avoided the use of the term "contributory negligence"; but, if we are wrong in our previous statements—and we do not think we are—the appellant was, at least, guilty of that. He has no more right to recover than a man who voluntarily sticks his hand into a buzz saw, or his finger into a hornet's net. The judgment is affirmed.

STONE, P. J., and HOGAN, J., concur.