## FURBER, Appellant, v. KANSAS CITY BOLT & NUT COMPANY.

**Division One, December 22, 1904.**

1. **NEGLIGENCE: Iron Beam: Fellow-Servant: Anticipating Injury.** Iron beams were raised by block and tackle to girders, to be fastened thereto by two bolts at each end, plaintiff fastening them at one end and a fellow-servant at the other. Plaintiff had fastened his end, and the fellow-servant had put in his two bolts and given the nut on one of them about two turns which caught hold of about two threads, and at this stage the block and tackle were removed, and the fellow-servant needing a washer to properly adjust the other bolt, plaintiff got down and got the washer for the fellow-servant, who adjusted the washer, turned on the nut and screwed it tight and to make it as tight as possible threw his strength on the wrench, when the bolt

broke under the strain, the other bolt on which the nut had but a slight hold pulled out, and that end of the beam fell, striking plaintiff, who sues for damages for the consequent injuries. *Held*, that the accident to plaintiff was not one that the company having the work in charge could reasonably have anticipated, *and*, there being nothing in the evidence to indicate that the block and tackle were to be kept under the beams until the bolts were securely fastened, and neither plaintiff nor his fellow-servant in any way indicating that their danger was enhanced by the removal of the block and tackle, the company was not guilty of negligence in taking them away at the time they did. The company was under no more obligation to anticipate plaintiff's injury under the circumstances than he was to use care after he had finished his work, to be out of the way of the falling beam.

2. ————:Inspection: Pleading. Where plaintiff charges his injuries to his master's negligence in furnishing him defective tools, the fact of inspection or non-inspection, except in cases where the law expressly requires inspection, is of no importance except as a circumstance bearing on the question of the alleged negligence, and a charge of non-inspection, as an independent act of actionable negligence, is not good pleading, since it anticipates a possible defense.

3. ————: ————: ————: Matter for Jury. In the face of such a petition if all the evidence on the subject of inspection is that defendant caused reasonable inspection to be made, the court should refuse to permit the jury to say whether or not there had been a proper inspection.

4. ————: ————: ————: ————: Best Method. If defendant used the very method of inspection which plaintiff points out would have discovered the defect, and no better method is suggested, there is no room in reason to permit the jury to say whether or not defendant was negligent in not inspecting the tools.

5. ————: Matter for Jury: Vague Testimony: Conjecture: Demurrer: Defendant's Evidence. When the court is asked to authorize the jury to find a fact from testimony so vague and uncertain that the inference to be drawn from it amounts to scarcely more than conjecture or the possibility that the fact might exist, then the court should look at the character of defendant's evidence, and, if the case is such that a verdict for plaintiff would necessarily have to be set aside, the court should not submit the question to the jury.

6. ————: Defective Tools: Insurer. The law does not make the master an insurer of the safety of his servants in handling the tools furnished them.

7. ———: ———: ———: **Defective Bolt.** The defendant manufactured from sixty to seventy thousand bolts a day, and plaintiff while employed in fastening iron beams to girders was injured by the falling of a beam, which fell when the bolt broke as the nut was being screwed thereon unusually tight. He showed that a mixture of scrap steel with scrap iron would produce a defective bolt, and that at one time for a few days defendant had at the time of a strike employed inexperienced men, but did not show that the bolt in question was made at that time, nor did he identify it, nor did he show that any scrap steel at any time went into the mixture from which the bolt was made, although he did show that some scrap steel had been bought, and the evidence that the bolt in question indicated that it was made of scrap steel was conflicting. *Held,* that to hold the defendant guilty of negligently furnishing a defective bolt to plaintiff's fellow-servant, whose wrenching of the nut caused the bolt to break, would be to hold manufacturers to be insurers of the perfection of all their products.

Appeal from Jackson Circuit Court.—*Hon. William B. Teasdale,* Judge.

AFFIRMED.

*L. F. Bird* and *H. G. Pope* for appellant.

(1) Defects apparent on the surface of the bolt were shown to the jury and the bolt was examined by the jury. The only evidence of inspection was that a man looked at the bolts before sending them to the threading department. It was the peculiar province of the jury to determine the sufficiency of the inspection of the bolt by the defendant. Gutridge v. Railroad, 105 Mo. 520. And to determine from the evidence, and their examination of the bolt, whether a reasonably careful inspection of the bolt, at some time before it was used, would not have disclosed the defect in it. Coontz v. Railroad, 121 Mo. 652. A master who himself manufactures and supplies an instrument is chargeable with such knowledge of its defects as ordinary care during such manufacture would have disclosed. Siela v. Railroad, 82 Mo. 435; Dedrick v. Railroad, 21 Mo. App. 436;

Hamilton v. Mining Co., 108 Mo. 373; Standard Oil Co. v. Bowker, 141 Ind. 18; Railroad v. Ryan, 52 Kan. 637. And when the evidence establishes negligence in the making of such an instrument by the master, it is not necessary to prove that he had notice of its defective condition. Standard Oil Co. v. Bowker, 141 Ind. 12; Crown Coal Co. v. Hiles, 43 Ill. App. 310. (2) (a) Defendant's instruction 9 is erroneous in telling the jury that all that was required of the defendant was to furnish the plaintiff with a place in which, if he used ordinary care, he might work with reasonable safety, and appliances which should be reasonably safe if used with ordinary care. It was the duty of the defendant to provide, not only the plaintiff, but also his fellow-workman, with a reasonably safe place to do the work and reasonably safe appliances to do the work with, and this duty was a personal, primary and positive duty and had to be performed by the defendant. In view of the fact that it was a defective bolt in the hands of the fellow-workman, that broke, this instruction, by informing the jury that all that was required of the defendant was to provide the plaintiff with proper appliances and neglecting to define its duty in that regard to the fellow-workman, is misleading and erroneous. (b) The instruction is misleading and erroneous in telling the jury that there was a presumption in the case that the defendant had discharged its full duty to the plaintiff. Where there is evidence of negligence on the part of the defendant and of contributory negligence on the part of the plaintiff, it is error to instruct the jury that either the plaintiff or the defendant is presumed to have exercised ordinary care until the contrary is shown, as such an instruction tends to mislead the jury. Bailey v. Railroad, 152 Mo. 461; Moberly v. Railroad, 98 Mo. 186; Rapp v. Railroad, 106 Mo. 428; Lynch v. Railroad, 112 Mo. 434; Brownfield v. Ins. Co., 26 Mo. App. 401.

*Pratt, Dana & Black* for respondent.

(1) Plaintiff made no case for the jury to pass on. The court should have so instructed the jury. It was held in Bartley v. Railroad, 148 Mo. 142: "Where the defendant has wholly exonerated itself from blame and overcome any possible presumption of negligence, and a verdict for the defendant is the only one that could have been allowed to stand, it is wholly immaterial whether or not the trial court erred in the declarations of law given to the jury, and a new trial should not be given even though the instructions were erroneous." The evidence presented made no case for the jury. (2) Suppose a piece of steel did happen to get into the composition of the bolt in question. How did it get there? The presumption is that the master did his duty. Smith v. Railroad, 113 Mo. 82; Breen v. Cooperage Co., 50 Mo. App. 214; 2 Thompson on Negligence, p. 1053, sec. 48; Wood on Master and Servant, sec. 382. (3) The jury found against plaintiff and the court having submitted the case on every reasonable theory, the verdict should be allowed to stand.

VALLIANT, J.—Plaintiff, in the service of the defendant, was assisting in placing in position an iron beam when the beam fell and struck him and inflicted injury; he sues for $25,000 damages, alleging that the accident occurred through defendant's negligence.

It was an iron beam, called in the record an eyebeam or I-beam, about 18 feet long, weighing several hundred pounds. The object was to fasten it to girders in the roof, so as to have it in position to connect with machinery to be afterwards attached.

There were six or eight of those beams to be used and the task of placing them was assigned to the plaintiff and his fellow-servant Fagan. The mode of operation was to swing the beam up to the height desired, by

means of a block and tackle, and so hold it until it was fastened at each end to the girder by bolts and nuts, two bolts at each end, the plaintiff fastening one end and Fagan the other. Each of the men stood while doing the work on a swinging platform. All of the beams intended to be put in place in this way had been so fastened except one. As to that one the plaintiff had fastened his end, had put in the two bolts and screwed on the nuts to hold them. Fagan had put his two bolts in and had given the nut on one of them about two turns catching hold of about two threads, just enough as he thought to hold it temporarily until he could fasten the other bolt. While it was in this condition the block and tackle with which the beam had been swung up was removed by the foreman. Fagan discovered that to properly adjust the other bolt he needed a washer and said to the plaintiff that he would get down and get one, but plaintiff having finished his end offered to get down and get the washer for him and did so and gave it to him. Fagan adjusted the washer, turned on the nut and screwed it tight with his wrench almost as close as it would go and to make it as tight as possible threw his strength on the wrench to give the nut another turn, when the bolt broke under the strain, the other bolt on which the nut had but a slight hold pulled out by force of the jar and that end of the beam fell and struck the plaintiff.

The petition charges that the defendant was negligent in three particulars: First, that it made the bolt out of inferior iron and allowed scrap steel to be mixed with the scrap iron out of which it was made, in consequence of which the steel in the mixture became burnt and rotten, rendering the bolt weak in places; second, that the defendant did not properly examine and inspect the bolt; third, defendant caused the block and tackle to be taken away before the beam was fastened. The answer was a general denial and a plea of contributory negligence.

At the conclusion of the plaintiff's evidence the defendant asked an instruction looking to a nonsuit, which was refused, and exception taken.

At the close of all the evidence the case was given to the jury, who returned a verdict for the defendant. Final judgment followed, and the plaintiff appealed.

We will consider the evidence bearing on the three alleged acts of negligence in the inverse order in which they are pleaded.

3. *The removal of the block and tackle.*

The office of the block and tackle as shown by the evidence was to lift the beam up to the position in which it was to be fastened. As soon as it was lifted up the ends were placed in position and two bolts were inserted through each end. These bolts when first inserted are called in the evidence "temporary bolts," which signifies that after being inserted they are to be adjusted by washers before being fastened permanently with the nuts, and in thus adjusting them they may be removed one at a time, leaving the other in place to hold up the beam. When the washers are applied and the bolt is adjusted the nut is screwed tight and the bolt is then permanent. When the temporary bolts are inserted they are sufficient to hold the beam in place while the operators are making the adjustment. One bolt on each end is sufficient to hold the beam alone; the only reason two are placed in each end is that machinery is to be afterwards attached and then two are required. While the other beams, before this one, were being placed in position the block and tackle were left at each beam until the bolts were securely fastened and then they were moved on to swing the next beam into place. But there was nothing in the evidence to indicate that the block and tackle were kept there to hold or to help hold the beam from falling, but only that it was left there until it was needed elsewhere and because it would be needed for the next beam as soon as the one in hand was finished. When the last beam was lifted up and the temporary

bolts inserted in each end, the block and tackle had done all·that they were designed to do and they were removed. Plaintiff relies on the testimony of his witness Fagan and the defendant's witness Neville to sustain the charge that it was negligence to remove the block and tackle at that time, but neither of them give the idea that the block and tackle were designed to hold the beam in place until the nuts were tightened, or that it was deemed necessary. They both said that the temporary bolts were sufficient and Neville said that he considered it entirely safe to take the block and tackle away after the temporary bolts had been inserted. The fact that Fagan did not turn the nut a little closer on the temporary bolt, and the fact that the other bolt broke, brought about a condition that the evidence does not warrant us in concluding was to have been reasonably expected or to be guarded against. Plaintiff and his witness and fellow-servant Fagan were there when the block and tackle were removed and if either considered that the danger was enhanced thereby he gave no indication of it. Of course after the catastrophe has occurred we can see how it might have been avoided. If the block and tackle had remained holding the beam, or if a strong scaffold had been erected there to catch it in case it should fall, the accident would not have occurred. And it is equally true that if the plaintiff had not been standing where he was he would not have been hurt. If this was a result that might reasonably have been anticipated a question might arise as to whether the plaintiff, who had already finished what he was to do, was observing the care that was to have been expected of him in remaining standing under the beam. If it was an accident that in its nature could with reason have been expected, then it was the duty of the defendant to have·left the block and tackle there or to have erected a scaffold or to have made reasonable guard in some way against it. But it is for failure to exercise forethought that the master is liable, not fail-

ure to do what is suggested only by afterthought. A danger that can reasonably be foreseen or anticipated the master is bound to foresee or anticipate, but he is not liable for failure to make preparation against an event that could not with reason have entered into the calculation of a man of ordinary prudence and experience.

The plaintiff was not entitled to go to the jury on the question of the defendant's negligence in removing the block and tackle.

2. *The failure of the defendant to examine, inspect and test the bolt.*

That is not (in itself and nothing more) an act of negligence for which the defendant would be liable in damages to the plaintiff. The gravamen of the plaintiff's complaint is that the defendant negligently furnished him a defective bolt. If the bolt was not defective the defendant is not liable even if it did not inspect it; and the circumstances might be such that even if the bolt was defective, the defect could not have been discovered by inspection, and in that event failure to inspect would not, *per se,* be actionable negligence. The fact that the defendant did make inspection and test, if such was the fact, might or might not, according to the other facts in the case, be a defense which the defendant might or might not, as he was advised, set up against the plaintiff's cause of action. In pleading noninspection in his petition, the plaintiff has gone out of his way to anticipate a possible defense.

The complaint is not merely that the defendant furnished a defective bolt, but that it did so negligently, which means that it did so without observing that degree of care that devolves on the master in such a case. In support of the allegation that the defendant acted negligently in the matter it was competent for the plaintiff to show, if he could by his evidence, that the defect was of such a character that it could have been discovered if the bolt had been inspected, and from that fact

an inference might be drawn that the defendant knew or ought to have known that the bolt was defective, and the defendant was at liberty to show, if it could by its evidence, that no reasonable inspection would have discovered the defect, or that in point of fact it did make a reasonable inspection. But except as a circumstance bearing on the question of negligence in furnishing the defective bolt, the fact of inspection or non-inspection is of no importance. We are not now concerned with a case of a kind in which the law expressly requires an inspection. Pleaded as it is in the petition in this case as an independent act of actionable negligence, the charge of non-inspection is not well pleaded.

The court refused to submit the question to the jury to say whether or not there had been a proper inspection, and in so doing the court was right, if for no other reason, because the only evidence in the case on that point was that the defendant did cause reasonable inspection to be made.

Assuming that the defendant made the bolt whose breaking caused the accident (about which, however, there is a question) the evidence showed that it was engaged in the nut and bolt business on a tolerably large scale, making 60,000 or 70,000 bolts a day, that they are all inspected by the men who handle and examine them before they are sent to the threading department, and after that they are examined again. It was shown that to test a bolt, it had to be broken and of course destroyed. The custom was to test a bolt occasionally by breaking it and examining the fibre; that process showed whether the iron they were using was what it should be and whether a change in the material or process should be made. There was no evidence to the contrary.

Some of plaintiff's witnesses testified that if, as was claimed by the plaintiff, steel scraps had been suffered to get into the mass of scrap iron of which the bolts were made, the defect which it would produce

could be seen with the naked eye on the surface of the bolt. The bolt in question was handled by the witnesses in the presence of the jury and by the jury; and the plaintiff's witnesses pointed to what they said was an indication of such defect. That object evidence not being before us we can not say whether or not it tended to verify what the plaintiff's witnesses said about it. The correctness of the statements of the witnesses on that point was put to the test of physical experiment, occular examination by the jury, and we cannot tell from the record how the statements of the witnesses stood that test, but assuming that the statements were true then it shows that the method of examination and inspection used by defendant was reasonable and the plaintiff suggests no better method. If the defendant in the daily course of its business used that method and no suggestion of a better method appeared, there is no room in reason to ask a jury to say whether or not the defendant was guilty of negligence in that respect. The court refused to submit that question to the jury and in that the court was right.

1. We come to the last alleged act of negligence, which in the order pleaded is the first, that is,

*That the defendant negligently furnished a defective bolt.*

In considering whether or not the plaintiff was entitled to go to the jury on this specification we must give him the benefit of every conclusion that could lawfully be drawn from his own evidence, aided, if it is aided, by the evidence of the defendant. Where the evidence of the defendant contradicts that of the plaintiff a question is presented for the jury, not for the court. Yet when the court is asked to authorize a jury to find a fact from the testimony so vague and uncertain that the inference to be drawn from it amounts to scarcely more than conjecture or the possibility that the fact might exist, then the court ought to look at the character of the evidence on the other side and if the case

is such that the verdict for the plaintiff would necessarily have to be set aside, the court should not submit the question to the jury.

The defendant was engaged in manufacturing bolts on a considerable scale, 60,000 or 70,000 in a day. It also frequently bought bolts from other manufacturers to fill orders and to keep bolts so purchased in stock. There is no positive evidence that the bolt in question was made by defendant, though there was evidence tending to show that it probably was. But assuming that it was made by the defendant, there was no evidence to show when it was made, the significance of which was to show that it was made during the period indicated in the evidence of some of the plaintiff's witnesses when in consequence of a strike new men, "green hands," were employed. The almost impossibility of identifying this bolt, as to who made it and when, will be at once appreciated when we think of the volume of the defendant's business in this line. Sixty or seventy thousand bolts in a day amount to 600,000 or 700,000 in ten days, and so on, soon amounting to millions. The plaintiff has done the best he could to trace the bolt to its origin and ascertain its date, but he is lost in the wilderness. His own inability to furnish any positive proof on this point exemplifies the impossibility of the task he would impose on the defendant of ascertaining that this bolt out of the millions it made and handled was without flaw.

The scientific fact on which the plaintiff relies is that scrap steel mixed with scrap iron does not make good material out of which to make a bolt, because in the melting of the mass the steel melts quicker than the iron and by the time the iron is melted the steel is so burned that its tensile strength is destroyed and the bolt is weakened. This fact is shown also in the evidence for the defendant, except that in defendant's evidence a distinction is drawn between hard steel and what was called railroad carbon steel between which

and iron in this particular there is, according to defendant's evidence, little, if any, difference,

The evidence for the plaintiff tended to show that for a period of two or three months before this accident new men, or "green hands" as they were called, were employed to gather up scrap iron for the furnaces, and some of these men testified that they gathered scrap steel as well as scrap iron in the mass, but none of those men knew or pretended to say that scrap steel was melted with the scrap iron out of which the bolts were made; when they, as common laborers, were done with gathering up and delivering the piles of scrap, their connection with the work was ended. The evidence for defendant shows that in the collection of scrap iron for this business pieces of scrap steel were liable to get into piles; it also shows that it was to the interest of the defendant to keep it out, and it shows the method of defendant used to separate the steel from the iron, and no other practical method is suggested in the plaintiff's evidence.

Plaintiff in his brief refers to the testimony of Mr. High, a witness for defendant and superintendent of defendant's works, as showing that scrap steel was used with scrap iron in making bolts; we do not so understand that witness. This is what he said on cross-examination by plaintiff's attorney:

Q. Do you handle any kind of steel out there? A. Yes, we handle steel, yes; we buy that in billets.

Q. In billets? A. Very low carbon.

Q. Do you put steel scrap with the wrought iron scrap, when you make these bolts? A. No, not unless it is some of our steel, railroad carbon steel, which is about equal to iron.

Q. I mean, do you put scrap iron that has steel in it, have it piled up there on piles? A. Oh, yes, yes, sir.

Q. Some iron and some steel mixed? A. Yes,

lots of it; we don't buy the steel because we want it, but it comes with the iron.

Q. It does come with the iron? A. Yes, sir.

Q. Now, if steel, a certain quality of steel, is mixed with this scrap iron, why, it will melt before the scrap iron, won't it? A. Yes, but we don't do that; we never do that.

Q. You have experienced men in your hobo gang that separates this scrap iron from scrap steel? A. Well, yes, most of them have been there long enough to know the difference between iron and steel.

Q. That is the reason they are called "hoboes" because they are inexperienced? A. No, that is a name they have given the laborers; I don't know why they call them hoboes.

Q. Well, do you call those fellows that you had there in the scrap pile that we have had on the witness stand experienced iron men, Mr. High? A. Well, no, I would not call them experienced iron men, certainly not.

Q. Did you ever tell them not to put in scrap steel with scrap iron? A. I caution them every day.

Q. You did caution them? A. I always do.

Q. Why did you do that, Mr. High? A. For the simple reason if they get a hard piece of steel in the pile, it ruins the pile and we can't do anything with it; say, for instance, we make a hundred pound pile, and they put in ten pounds of hard steel, it will just ruin a hundred pounds of iron; we can't use it; we can't roll it.

Q. You employ there most any man that comes along to pick up iron, don't you, in that hobo gang? A. Oh, yes, will do that most any time.

Q. And yet it was necessary for those men that you pick up off from the streets here to tell a certain quality of steel they should pick out and put in a certain other quality of steel? A. No, you are mistaken on that; you're mistaken there.

Q. Well? · A. Picking up steel and putting steel from the pile to the bench are two different classes of men. When we sort steel for piling, we, as a rule, use old men that have been with us for some time.

If the witnesses upon whom the plaintiff relies to prove that scrap steel was gathered up with scrap iron are competent to know steel from iron, the men whom Mr. High says he set to separate the steel from the iron ought to be deemed competent also.

Plaintiff introduced as expert witnesses blacksmiths who had long experience in working with iron, and who said that the best bolts were made of the best iron—Norway iron—and that scrap iron would not make the best bolts. But on further examination it appeared that they were talking about hand-made bolts for certain kinds of machinery. All the evidence on the subject was to the effect that machine-made bolts in all the large manufactories were made of scrap iron, and such bolts were in common use for ordinary purposes. There was no evidence to the contrary. These expert witnesses handled this broken bolt in the presence of the jury, and pointed out what they said were indications of burnt steel in its composition. Expert witnesses on the other side also handled it and showed it to the jury and said that it showed no such indications and gave no sign of a defect; they also said that bolts of that size without flaw were sometimes broken by a strong hand screwing a nut with a strong wrench.

Assuming that there was substantial evidence for the plaintiff tending to show that there was a defect in this bolt, there was not any substantial evidence to show that in the ordinary course of its business and with the use of such care as was to be expected of a man of ordinary prudence and experience engaged in business of that kind the defendant knew or could have known that this bolt was defective. Among the great number of bolts turned out by a concern like this it would be wonderful if occasionally a defective bolt was not found in

the pile, but to hold the manufacturer liable under the circumstances of this case would be to render him an insurer of the perfection of all his product.

Appellant complains of the giving and refusing of some of the instructions, but it is immaterial what the instructions were, because there was no evidence on which the court could sustain a verdict for the plaintiff.

The judgment is affirmed.

All concur, except *Robinson, J.,* absent.