Clovis E. CLYMER, Plaintiff-Appellant,

v.

W. B. TENNISON, Defendant-Respondent.

No. 23969.

Kansas City Court of Appeals.

Missouri.

Dec. 7, 1964.

Frieze & Crandall, Carthage, for appellant

Ewing, Ewing, Ewing, Carter & Wight, Nevada, Combs & Combs, Lamar, for respondent.

CROSS, Judge.

On August 21, 1963, judgment was originally entered in plaintiff's favor upon a jury verdict awarding him damages in the sum of $10,000.00 for personal injuries received when he fell from a truck load of hay while engaged in hay harvest work on the farm premises of defendant. On September 9, 1963, the trial court sustained defendant's timely motion to set aside the verdict and judgment in favor of plaintiff and enter judgment in favor of defendant in accordance with his motion for a directed verdict, based on allegations (1) that plaintiff's evidence was insufficient in law and (2) that all the evidence is insufficient to support the verdict, or in the alternative,

for a new trial. The court duly entered judgment for defendant and further ordered "that in the event that judgment for the defendant herein granted is reversed the alternative motion of the defendant for a new trial is granted on the grounds stated therein". Plaintiff has appealed. The primary question raised is whether plaintiff made a submissible case.

Plaintiff alleges in his petition that his fall and consequent injuries were occasioned by the falling of iron forks from the track of a haylift mechanism he was operating while engaged as defendant's employee in the work of storing hay in a barn located on defendant's farm premises. The petition further alleges that plaintiff's fall and injury were caused by negligence on the part of defendant in that he (a) failed to furnish plaintiff a reasonably safe mechanical haylift with which to work and to exercise ordinary care to inspect it and keep it in reasonably safe condition, (b) failed to inspect the haylift and thereby discover its alleged defective condition, and (c) that he knew or by the exercise of ordinary care could have known that the haylift was unsafe for use in time, thereafter, to have so warned plaintiff or to have repaired it. Defendant's answer generally denies the allegations of plaintiff's petition and sets up special defenses of plaintiff's contributory negligence and negligence on the part of fellow servants.

The circumstances and events giving rise to this controversy are substantially as here noted:

Defendant owned and operated a farm in Barton County on which he raised a crop of hay in 1958. On August 21st of that year, plaintiff and a group of other neighboring farmers were working as a crew assisting defendant in hauling and storing his hay crop in the barn located on his farm. It appears that this work was done for defendant on a mutual help or "trade" basis. Plaintiff and the other farmers assisting defendant were experienced in the work they were doing and were familiar with the particular operations being performed.

On the day of the accident defendant was operating the hay baler in the field. Also working in the field was his neighbor Loren Potts. Plaintiff and Melvin Dirkenson were operating trucks hauling baled hay from the field to the barn where it was lifted from the trucks to the loft by the mechanical device in question. Working in the loft to carry and place the hay as it was dumped were Floyd Shell, Joe Wheeler, Lee Manley and Glenn Stump. Defendant's wife was operating a tractor which pulled the loaded carrier back into this hayloft by means of a heavy rope running on pulleys. The above described crew was not under the direction of any particular person.

Defendant's barn was 64 feet long, running north and south, with an opening into the loft on the south side. Running along the ridge beam in the loft and attached to the barn rafters by steel strap hangers was a V-shaped track upon which the haylift mechanism operated. So suspended, the track extended to the north end of the loft and a few inches past a "stop" consisting of a 2 x 4 board nailed crosswise of two rafters. The track was positioned directly under the 2 x 4 and had been secured to it by several wrappings of No. 12 wire. Running upon the track, suspended by rollers, was a "carrier", consisting of a steel frame supporting a set of variously designated "hooks", "claws", "eagle claws", "tongs" or "forks", weighing in the aggregate of approximately 60 pounds, so devised that they could be tripped by a small rope (pulled by hand), and lowered at the south end of the track where they hook down on or grab a load of hay bales from a truck standing below. The loaded hooks would then be pulled "back up to the top" where they re-engaged with the rest of the carrier on the track. The entire load was then pulled into the barn loft by the tractor.

On the south end of the track, extending several feet out the south end of the barn,

were three devices. These were, in order running north and south, (1) a "stop" mechanism to engage the carrier when pulled against it by the pull rope and to trip the forks; (2) a key or safety bolt extending through the track to intercept and hold the carrier in case it did not engage with the regular stop, and (3) a cable clamp for the same purpose, which defendant had installed in addition to the key bolt for "extra safety". Ordinarily, and when the mechanism is in complete assembly and in proper working condition, the carrier engages with the stop when pulled against and does not come in contact with the safety key bolt or the "extra safety" cable clamp.

An essential working part of the carrier mechanism is a "shoe" or "U clamp" which is the device that engages with the stop, locks the carrier to it and trips the fork. When defendant purchased the farm (in 1948 or 1949) he discovered that the carrier would not engage with the stop and trip the forks, and that the reason for such malfunction was that the shoe was missing. He obtained a replacement shoe and installed it, generally overhauled the entire haylift mechanism, and installed the above mentioned cable connector on the end of the track as an extra safety measure. Thereafter, the carrier would properly engage with the stop and never come in contact with the safety bolt and the safety cable connector and defendant experienced no further trouble with the operation of the haylift.

Such were the conditions generally existing on the morning of August 21, 1958, prior to the occurrence of two events of mischance—separate and distinct in general nature, point of time and result—the first of which stands in no direct causal relation to plaintiff's injury, the second being an immediate, direct and producing cause.

The first incident occurred while plaintiff and his fellow workers at the barn were unloading a truck load of hay bales plaintiff had driven from the field shortly before noon. Standing on top of the load, plain-tiff pulled the carrier to the south end of the track directly over the truck, engaged it with the stop and lowered the fork, all by means of the trip rope, and attached the fork to a load of 8 bales. Next, the tractor backed up and pulled the loaded carrier up and into the loft by means of the large rope, to a point in the middle of the barn. The men in the loft wanted the load pulled farther north. Someone called "further", and plaintiff either told or motioned the tractor driver to back the tractor farther south. As directed, the driver backed the tractor several feet farther south, pulling the loaded carrier weighing in excess of 500 pounds to the extreme north end of the track, against the 2 x 4 stop.

The impact drove the carrier and hay load through and under the wooden stop and off the end of the track. In the words of plaintiff's witness, Floyd Shell, " * * * naturally a load of hay will swing when it hits and it just swung so hard that it bounced the track down and the whole business just slid right in under (the stop) and came off". The men in the loft with the help of some of the men on the ground then undertook to reassemble the carrier and forks with the track. While some of them pulled down on the end of the track, others pushed up the fork and "after a time" got the carrier wheels back on the track. In so doing, however, they failed to notice that the shoe (U clamp) had fallen out of the carrier mechanism and was missing. (It was later found lying on the floor of the loft). Consequently, they replaced the carrier and forks on the track without that essential part, oblivious of its absence. The attempted repair operations above described took some appreciable time—according to one witness at least one half hour.

The second incident occurred after the hay crew attempted to resume their interrupted work. Again taking his stand on top of the truck load of hay, plaintiff took hold of the trip rope and gave it a pull which "pulled the carrier down" (from the loft to the south end of the track overhead)

but "it didn't catch * * * it just rolled back in the barn". Plaintiff pulled again, harder, but the carrier again didn't catch. Floyd Shell, who was standing on the ground, after telling plaintiff "you ain't giving it a hard enough jerk", took hold of the rope and together he and plaintiff gave it a jerk which again pulled the carrier out to the south end of the track. As before, the carrier "banged" against some mechanism "on the end of the line", failed to "catch there and lock", and rolled back into the barn. Shell and plaintiff then gave a "second yank" on the trip rope. According to plaintiff's witness Dirkenson, "the rope was being pulled pretty tight and pretty fast" and "with a great force". This final effort pulled the carrier and forks completely off the end of the track. Plaintiff narrates the incident as follows: "And together the two of us give it maybe, well, I'll say the second yank and then here it come right out in my face". Although the carrier and forks fell in plaintiff's direction they did not strike him. His fall from the truck is explained by the following excerpts from his testimony:

"Q. What happened to you then, Mr. Clymer?

"A. I got overbalanced, I was standing on the edge of the truck and I got overbalanced.

* * * * * *

"Q. When it came off the end of the track, what happened?

"A. Well, I didn't pull it off the end of the track, I had some assistance.

"Q. All right, you had some assistance, you and Mr. Shell pulled it off the end of the track.

"A. That's right.

"Q. You and Mr. Shell pulled it off the end of the track but then what happened?

"A. I fell off, I got overbalanced and fell.

"Q. The result of the two of you pulling on the rope overbalanced you?

"A. That's right .

* * * * *

"Q. I mean you didn't jump to get out of the way?

"A. Oh, no, no."

In falling to the ground plaintiff sustained injury to his back.

Defendant was in the hay field one mile away from the barn when the carrier was pulled off the north end of the track by the tractor. He had no knowledge of that incident or of plaintiff's fall until he came to the house a few minutes before noon. At that time he observed the south end of the track, saw that both the bolt stop and cable clamp were missing and told the men "there would have to be another one put back on there". Loren Potts and Joe Wheeler found the cable clamp on the ground and put it back on the track. It does not appear from the evidence that the bolt was found or replaced. Upon examination of the carrier, defendant also discovered that the shoe had been left out. He procured a replacement for it from the shop and the men installed it. Thereafter the carrier would engage the stop and trip the forks properly.

Plaintiff's brief contains the preliminary statement that the first question on this appeal is whether he made "a submissible case of negligence under the common law duties applicable to the master in master-servant relationship". Plaintiff's pleadings, trial theory, instructions and principal appeal assignments are based on the law of master and servant. Inasmuch as defendant makes no contention or suggestion that the status of the parties is other than that of master and servant and has himself invoked the rules of law applicable to that relationship, we deem it most expedient to assume for the purpose of this opinion, without specifically so holding, that plaintiff and defendant stood in master-servant relationship.

■ As a general rule, often repeated by Missouri courts, although the master is not an insurer of the safety of his servant, it is his duty to exercise reasonable or ordinary care to furnish the servant a reasonably safe place to work, to provide him with reasonably safe machinery, tools and appliances, and to maintain the same in a reasonably good state of repair. Plaintiff's case is bottomed on this rule, in that his petition charges defendant with specific negligence in failing to exercise ordinary care to furnish a reasonably safe haylift with which to work, and in failing to exercise ordinary care to inspect it and keep it in reasonably safe condition. Plaintiff's case was submitted to the jury, on the theory pleaded in those allegations, by two verdict directing instructions.

Instruction No. 2 predicated a finding and verdict for plaintiff on the hypothesis that defendant negligently furnished a haylift for plaintiff's use that was dangerous and defective. Instruction No. 1 predicated the same finding and verdict on the hypothesis that defendant negligently failed to make an inspection of the haylift that would have revealed it to be in a defective and dangerous condition. Thus, to support a finding and verdict for plaintiff under the direction of either instruction there must necessarily have been evidence that the haylift was in a dangerous and defective condition, or at least was not in a reasonably safe condition.

■ Plaintiff correctly insists under authority of Probst v. Seyer, Mo.Sup., 353 S.W.2d 798, that in determining the submissibility of his case we must consider the evidence in the light most favorable to his contentions and give him the benefit of all favorable inferences that reasonably may be drawn from such evidence. However, plaintiff must adduce substantial evidence. A mere scintilla of evidence is insufficient. Davidson v. Hennegin, Mo.Sup., 304 S.W. 2d 836. Nor is there any presumption of liability to be drawn from the mere fact that an accident occurred and caused injury

to plaintiff. Schaller v. Lusk, Mo.App., 184 S.W. 1179. We are further admonished in Probst v. Seyer, supra, as follows: "But, of course, the case is not to be submitted unless each and every fact essential to liability is predicated upon legal and substantial evidence. Neither may any fact essential to submissibility be inferred in the absence of substantial evidentiary basis. In other words, liability cannot rest upon guesswork, conjecture or speculation beyond inferences reasonably to be drawn from the evidence. * * * The question of whether the evidence in a given case is substantial is one of law for the court. * * *" (Citations omitted.) Greenwood v. Vanarsdall, Mo.App., 356 S.W.2d 109.

■ We shall observe the further rule that "In order that negligence may be inferred from the circumstances, the evidence must be such as to exclude guesswork, speculation, and conjecture. * * * And to remove the case from the realm of speculation the circumstances must be such that the party having the burden of proof has facts which give more than an equal basis for one of two or more inconsistent conclusions. * * * The conclusion reached must be the one which is 'more reasonable and probable' * * * 'reasonably follow(s)' * * * and 'reasonably eliminate(s)' the probability of any other source or cause. * * *" (Citations omitted.) As stated in Furber v. Kansas City Bolt & Nut Co., 185 Mo. 301, 84 S.W. 890, "* * * (W)hen the court is asked to authorize a jury to find a fact from testimony so vague and uncertain that the inference to be drawn from it amounts to scarcely more than conjecture or the possibility that the fact might exist, then the court ought to look at the character of the evidence on the other side; and, if the case is such that a verdict for the plaintiff would necessarily have to be set aside, the court should not submit the question to the jury".

■ Plaintiff contends that the haylift mechanism was shown to be defective, through defendant's negligence, in these

two particulars: (1) that the track was so improperly and insecurely wired and fastened to the stop at the *north* end of the barn that the carrier was caused to run off the track and fall to the floor; (2) that the safety devices on the *south* end of the track had become loose and would not hold the carrier and forks when pulled past the regular stop and against them. We do not deem it necessary to consider or decide whether the carrier mechanism was in a reasonably safe condition at its north end. That question would be material only in case the pulling of the loaded carrier against and through the 2 x 4 stop were held to be a proximate cause of plaintiff's accident and injury. Our ruling is otherwise, as this opinion has earlier forecast. It is our view that the occurrence, whether or not caused by defendant's negligence, was only a remote or predisposing cause, that it merely produced a condition giving opportunity for other causal agencies to act, and that it has no legal causal connection with plaintiff's accident and injury. It appears from uncontroverted evidence that the incident terminated without producing injury to plaintiff or damage to the devices on the south end of the track, and that new forces and agencies arose and actively intervened as independent, efficient and legally proximate causes of the casualty, the first of which was the unskillful reassembly of the carrier on the track without the essential shoe. We reach these conclusions under the following authority which the Supreme Court, in Duke v. Missouri Pacific Railroad Co., 303 S.W.2d 613, has promulgated as the law of this state:

" 'Where a second actor has or should have become aware of the existence of a potential danger created by the negligence of an original tort-feasor, and thereafter, by an independent act of negligence, brings about an accident, the first tort-feasor is relieved of liability, because the condition created by him was merely a circumstance of the accident and not its proximate cause.' 65 C.J.S. Negligence § 111 b, notes 44, 45, p. 692.

" 'A prior and remote cause cannot be made the basis of an action if such remote cause did nothing more than furnish the condition or give rise to the occasion by which the injury was made possible, if there intervened between such prior or remote cause and the injury a distinct, successive, unrelated, and efficient cause of the injury, even though the injury would not have occurred but for such condition or occasion. If no danger existed in the condition except because of the independent cause, such condition was not the proximate cause; and, if an independent negligent act or defective condition sets into operation the circumstances which result in injury because of the prior defective condition, such subsequent act or condition is the proximate cause.' 65 C.J.S. Negligence § 111 d, p. 693".

The remaining essential question is whether there is any substantial evidence to support a finding or from which it can reasonably be inferred that the safety bolt and U clamp on the south end of the track had become loose, and consequently ineffectual as safety devices, so as to render the haylift not reasonably safe prior to the time in question. There is no direct evidence bearing on the condition of the bolt and clamp *before* the accident except defendant's testimony. At the trial he testified that he "checked the whole top" about two days before starting his hay work in 1958; that "I always had to go up, check the birds' nests—and knock them all out of there and oil it but when I'm up there I always try to check the whole thing from one end to the other". He stated that he found that the cable clamp and bolt on the south end were tight. In a deposition given prior to the trial defendant had admitted he didn't go out on the end of the track and see about the stop when he was checking it and that his "check of the things then"

**836**

consisted of "checking your carrier to be sure there was no bird nests in it and that the thing was oiled and properly rolling on the track or would roll along the track".

Plaintiff attempts to establish that the clamp and bolt were loose by testimony either referable to their condition *after* the carrier fell off or in the nature of "opinion" evidence. His witness Floyd Shell testified that "constantly hitting of the end of the track—would loosen the bolt absolutely". Referring to the last time he and plaintiff jerked the rope, Shell stated "The next time I pulled on it a little harder and off the whole works come, the bolt wasn't tight on the—south end of the track and let it slide right on off. * * *" Plaintiff's witness Loren Potts testified that when he and Joe Wheeler put the safety clamp back on the south end, "From all indications from the marks on the rust or the age on the bolt we tightened it back a little tighter than it had been which is commonly necessary that you can do", and that a clamp stretched around a bar would naturally stretch and loosen to some extent. As to the effect of pulling the carrier, without its engaging shoe, against the safety clamp and bolt, the testimony of witness Potts is as follows:

"Q. Had you pulled it by the rope, what would have happened?

"A. We could have by complete jerking I would say, say the pull rope up here, and got plenty of slack, let it back here and three or four hard pulls would have knocked that lock off of there regardless.

"Q. Regardless of what?

"A. Regardless of how tight it was, but if you ever stop to think you are standing down here at a twenty-five degree angle and your rope you are pulling here, did you ever stop to think that you pull down two foot a second, that it will roll that carrier at a speed of fifty foot a second.

"Q. In other words, pulling on that rope would hit—

"A. It would pull that carrier—

"Q. If the "U" clamp was not in there, it would hit the safety stop with a violent force, is that right?

"A. That's right.

"Q. You say it would probably be knocked off of there no matter how tight it was bolted on?

"A. That is right with a clamp, that is right. It would be mighty hard to get anything tight enough to hold that for after those tracks get smooth, the rust off of them and the wheels rolling easy, they can come of an awful force.

"Q. That can be exerted by the trip rope?

"A. That is right.

"Q. Would you say two men pulling on that rope could exert sufficient force to knock that safety catch off no matter how it was fixed?

"A. I'd say one man could".

Melvin Dirkenson, also a witness for plaintiff, stated that the jarring of the trip mechanism would cause nuts on a bolt to loosen. Dirkenson also testified:

"Q. From your knowledge of this type of hay carrier, when the carrier was pulled to the south end of the track and it didn't latch to that stop, did that put you on knowledge that something was wrong with the carrier? A. Yes.

"Q. Did you tell Mr. Clymer that there was something wrong with the carrier? A. No.

"Q. Did you tell Mr. Shell? A. No.

"Q. That there was something wrong with the carrier? A. No.

"Q. Did you see Mr. Shell or Mr. Clymer pulling on the release rope? A. No.

"Q. You saw the carrier banging against the west end of the track from the barnloft, is that right? A. From the south end.

"Q. From the south end, that's right, did you see that? A. Yes.

"Q. Did you warn anybody that there was something wrong? A. No.

"Q. Why didn't you? A. Before I even could say, it was already off".

 There is no substantial evidence to show directly or from which it can reasonably be inferred that the safety bolt and clamp were loose or otherwise defective prior to the time they were subjected to repeated blows of the misassembled carrier. The jury could make such finding only by "guesswork, speculation or conjecture". Moreover, the evidence does not establish the desired inference as the more reasonable and probable conclusion to be drawn therefrom. We believe that the facts and circumstances in evidence point at least as reasonably to a conclusion that the bolt and clamp were fastened to the track in a reasonably secure manner. Three times successively they resisted the driving force of a 60 pound metal mechanism propelled against them "with great force". It took the fourth blow, combining the efforts of two men, to drive or shear them from the track. Since plaintiff has failed to establish the basic, underlying fact of his case, to-wit, that the safety bolt and clamp were not reasonably safe, we necessarily rule that he did not make a case sufficient for jury submission. In resolving this issue we have duly considered the cases cited and relied upon by plaintiff but do not find them persuasive.

 We are urged by defendant to find that plaintiff was guilty of contributory negligence as a matter of law and that such negligence was the proximate cause of his injury. It is unnecessary to decide this question in view of our ruling above. The failure of plaintiff to establish actionable negligence on the part of defendant is sufficient to support the trial court's action in setting aside the verdict and judgment for plaintiff and entering judgment for defendant.

 Whether or not there was evidence from which the jury could have found defendant failed to make reasonable inspection of the haylift has no bearing on our decision. In the words of Judge Valliant, speaking for the Supreme Court, *"The failure of the defendant to examine, inspect and test the bolt * * * is not (in itself, and nothing more) an act of negligence for which the defendant would be liable in damages to the plaintiff. The gravamen of the plaintiff's complaint is that the defendant negligently furnished him a defective bolt. If the bolt was not defective, the defendant is not liable, even if it did not inspect it; and the circumstances might be such that, even if the bolt was defective, the defect could not have been discovered by inspection, and, in that event, failure to inspect would not, per se, be actionable negligence. The fact that the defendant did make inspection and test, if such was the fact, might or might not, according to the other facts in the case, be a defense which the defendant might or might not, as he was advised, set up against the plaintiff's cause of action. In pleading noninspection in his petition, the plaintiff has gone out of his way to anticipate a possible defense. * * * But except as a circumstance bearing on the question of negligence in furnishing the defective bolt, the fact of inspection or noninspection is of no importance".* Furber v. Kansas City Bolt & Nut Co., 185 Mo. 301, 84 S.W. 890.

Plaintiff complains in his final assignment that the order of the trial court wherein "the alternative motion of the defendant for a new trial is granted on the grounds stated therein", is not in compliance with Section 510.370, V.A.M.S. and Civil Rule 75.01 V.A.M.R. because the order contains

no specification of grounds for granting the new trial. We deem it unnecessary to consider the point. It is immaterial whether the order complained of meets the cited requirements, since it is conditioned upon a reversal of the judgment for defendant. That condition will not be satisfied.

The judgment is affirmed.

All concur.