**Jack WEBER, Appellant,**

v.

**Norman Luther HINDS, Respondent.**

**No. 25074.**

Kansas City Court of Appeals.

Missouri.

April 7, 1969.

Bundschu, Bailey & Disney, Kansas City, for appellant.

Deacy & Deacy, Edward W. Mullen, D. Lee McMaster, Kansas City, for respondent.

SHANGLER, Judge.

Plaintiff Jack Weber brought suit for damages against his uncle, defendant Norman L. Hinds, for those injuries suffered when he fell from the roof of defendant Hinds' residence at 7611 Jefferson in Kansas City, Missouri. The pleaded theory of recovery was that defendant had expressly invited plaintiff to help repair that roof, and, at defendant's direction, plaintiff ascended a ladder for access thereto. It was further alleged that as plaintiff stepped from the ladder onto the roof, the covering tar paper, or "felt" as it was also called, "slipped", so that the plaintiff lost his balance and fell to the ground. Actually, there was no evidence of "slipping" of the paper; rather, the only evidence was of a tearing of it. Plaintiff submitted on the is-

sue that the tar paper was "inadequately se-
cured", so that the roof was not reason-
ably safe, and that defendant negligently
failed "to secure it or warn of it". The
jury found the issues for defendant; judg-
ment was entered in his favor and plaintiff
appeals.

Plaintiff contends the trial court com-
mitted error by submitting Instruction No.
8 on behalf of defendant. We need not
elaborate the point as our disposition of
this appeal makes it unnecessary. The de-
fendant, on the other hand, asserts, inter
alia, that plaintiff's evidence failed to make
out a submissible case as the condition of
which plaintiff complained was open and
obvious, as well known to him as to defend-
ant; therefore, he argues, the judgment
should stand.

As we review the evidence, we make no
reference to that testimony bearing on the
issue of plaintiff's status while on defend-
ant's premises. It was a vigorously con-
tested issue. We assume throughout our
discussion that plaintiff was defendant's in-
vitee as, in any event, plaintiff did not
prove a submissible case.

On Saturday, August 14, 1965, plaintiff
Weber, in the company of his wife and
child, appeared at defendant's home about
8:00 o'clock A. M. to help defendant in
the task of replacing the roof of his home.
According to plaintiff, this help was intend-
ed as a gesture of reciprocity for defend-
ant's efforts in moving plaintiff from
Kansas City to Independence. Defendant
Hinds was an experienced carpenter, al-
though not then occupied as such and had
constructed the second story addition to his
home all by himself. It came to leak badly,
so he undertook to replace the roof and by
the day of the occurrence, he had torn the
shingles from it and the sheeting from the
rafters. He had also covered the roof with
plyboard sheeting and nailed it sufficiently
securely to hold it in place. The only
things remaining to be done on Saturday
were the additional nailing of the plyboard
sheeting, removal of debris to the dump

and the covering of the roof with tar pa-
per.

When plaintiff arrived that Saturday
morning he helped with discarding the de-
bris at the dump. Upon their return, de-
fendant fitted plaintiff with a nail apron
and hammer; they ascended to the roof
and nailed down the sheeting. Plaintiff
had never before done any roofing. He
estimated the pitch of the roof at 40 de-
grees and its height above the ground at 12
feet. He, himself, weighed about 180
pounds or more and was then attired in
low cut, rubber soled tennis shoes. He
knew that his uncle, defendant Hinds, was
a practiced carpenter and was relying upon
his knowledge of carpentry. Plaintiff was
aware of the presence of toeboards at dif-
ferent locations on the roof which con-
sisted of two by fours, fourteen feet in
length. He was aware of their function
as safety devices designed "to keep you
from sliding off" the roof and appreciated
the possibility of injury should he fall to
the ground. Defendant, on his part,
acknowledged the dangerous aspects of
roofing and was aware, as well, of plain-
tiff's lack of experience in such work.
Michael Brogan (who had become defend-
ant's son-in-law by the time of trial) and
Harold Phelps worked on the roof inter-
mittently, although it is not clear how long
they were in the vicinity. They were not
present at the time of plaintiff's fall, and
did not witness it.

At about 12:30 o'clock P.M., Mrs. Hinds
served lunch informally and plaintiff con-
sumed several cans or bottles of beer fur-
nished by Mrs. Hinds before work was re-
sumed at about 2:30 o'clock P.M. By
plaintiff's account, he, Brogan and defend-
ant returned to the roof and completed the
nailing of the sheeting within 15 minutes.
Plaintiff and Brogan descended to the
ground and then, at defendant's request,
plaintiff handed him a roll of tar paper
while standing on a ladder and then moved
the ladder from west to east. From the
ground, he observed defendant securing the

tar paper, going from west to east, spacing the nails between 18 inches and 25 inches. He did not have any judgment as to the number of nails in the paper, and did not know if it was enough to support him or anyone else. Upon cross-examination, his analysis of defendant's work was somewhat differently stated. The substance of that testimony, as well as his deposition statements, the truth of which he acknowledged, will be recounted later. According to plaintiff, defendant then proceeded to pry loose two toeboards and place them laterally to, and about two feet above, the eaves. Although he had needed no help with the other two toeboards, he loosened the third one and requested plaintiff to come upon the roof once again to help him nail it down "in line with the others". Plaintiff admitted on cross-examination that as the ladder protruded about 6 or 8 inches above the roof, he could have nailed the toeboard in the desired position more easily from the ladder. Nevertheless, he stepped off the ladder, attempting to clear the three feet width of the tar paper in so doing, and succeeded in placing his toe on the plyboard and his heel on the tar paper. The tar paper "broke loose" and he fell to the ground below. During that maneuver, the third toeboard was in defendant's hands. Plaintiff was not aware "that tar paper would tear under those conditions", or that it would "give way". Mr. Hinds did not warn him not to step on the tar paper, although at the time he stepped on it, plaintiff thought it to be secure. In his cross-examination testimony, once again his version of the incident varied. We shall also recount that later.

Fred Weber, plaintiff's brother, was the only other witness to the fall in addition to the parties themselves. He was a boarder at the home of the defendant, his uncle. He generally corroborated plaintiff's account of the occurrence. He observed defendant was on the roof nailing the first strip of tar paper near the edge of the roof; plaintiff had handed defendant a roll of tar paper; two toeboards had been nailed along the edge of the roof. Defend-ant asked plaintiff to "come up here * * * and put on the toeboard". He saw his brother go upon the roof and "before they had even passed the toeboard * * * the tar paper gave way at that time from the nails, and that is when the fall—that is when he fell". He dragged his brother from his prostrate position, placed him in an easy chair, ran to the ladder, climbed to the roof and observed the area "where the paper tore"; the nails "were hammered down all the way into the tar paper" as to indent it as the paper was "fairly thick * * * maybe an eighth of an inch". When plaintiff had gotten both feet on the tar paper, about one or one and one-half feet from the edge of the roof, he turned around to grasp the edge of the toeboard and the tar paper gave way. The witness could see the nails in the paper from the ground but not how many or how deeply they were imbedded in the paper.

Defendant Luther Norman Hinds testified that he had worked as a carpenter for ten or twelve years. When they went up to the roof to nail the plyboards, toeboards were used as safety devices. After lunch, he went upon the roof, laid the first tier of tar paper from west to east at the bottom of the roof and nailed it down. He then brought the toeboards down, nailed them about in the center of the paper sheet, estimated by plaintiff to have been about three feet in width, so that in laying successive sheets of tar paper above, he would have a place for secure footing. He had nailed down two toeboards without help and uneventfully. He had placed the third toeboard down as to overlap the second, had driven a 16 penny spike through it and was about to move out upon it from his sitting position on it in order to nail it, when plaintiff came from defendant's left side, walking between defendant and the roof, "to the end of the toeboard, walked out onto the tar paper, reached down and got hold of the toeboard and went off the roof—taking the toeboard with him", and tearing the tar paper in the process. This was defendant's first indication that plaintiff was on the roof at that time.

Upon cross-examination, defendant acknowledged that roofing a house was dangerous and that plaintiff was inexperienced. Plaintiff had helped in laying the first roll of tar paper and had stood on the toeboard above the paper unravelling it, while defendant nailed the paper. This course was followed from west to east across the entire roof. Defendant spaced the nails about two feet apart at the top of the paper and about six to eight inches apart at the bottom of it. As the bottom of the paper could not readily be reached from the toeboard above, it was nailed by defendant while standing on the ladder, using scaffolding between two ladders, as well. He did not recall whether it was plaintiff or Mike Brogan who helped him in this project. Whoever it may have been, he had returned to the ground while the nailing of the bottom of the paper was in progress. He did not tell plaintiff not to walk on the tar paper as he "didn't dream he was going to".

There can be no doubt but that the liability of a' possessor of land to his invitee has been governed according to the rule stated in 2 Restatement of Torts, Sec. 343 and enunciated by the Missouri Supreme Court in Dixon v. General Grocery Company, Mo.Sup., 293 S.W.2d 415 at page 418. Countless decisions of our appellate courts have followed this rule without exception. Harbourn v. Katz Drug Company, Mo.Sup., 318 S.W.2d 226; 74 A.L.R.2d 938; Sellens v. Christman, Mo.Sup., 418 S.W.2d 6; Kenward v. Hultz, Mo.App., 371 S.W.2d 344. As expressed in those cases, and others, following Sec. 343 of the Restatement of Torts, "the basis of the defendant-proprietor's liability is defendant's superior knowledge of an unreasonable risk of harm of which the invitee does not or in the exercise of ordinary care should not know. A defendant is not liable for injuries due to dangers which are obvious, or as well known to plaintiff as to defendant. And in such circumstances there is no duty to warn because the invitee has the information which would be conveyed by a warning." Stafford v. Fred Wolferman, Inc.,

Mo.Sup., 307 S.W.2d 468 at pages 473 and 476; Milliken v. Trianon Hotel Company, Mo.App., 364 S.W.2d 71. Furthermore, the duty to keep the premises free from unreasonable risk of injury " 'applies only to defects or conditions which are in the nature of hidden dangers, traps, snares, pitfalls, and the like, in that they are not known to the invitee, and would not be observed by him in the exercise of ordinary care. The invitee assumes all normal, obvious, or ordinary risks attendant on the use of the premises, and the owner or occupant is under no duty to reconstruct or alter the premises so as to obviate known and obvious dangers'. 65 C.J.S. Negligence § 50, page 541;" Capobianco v. Yacovelli Restaurant, Inc., Mo.App., 360 S.W.2d 302.

The Restatement Second, Torts, series, published in 1965 rephrased its previous Section 343 which we have discussed, and adopted in lieu, Section 343 and 343A. A new dimension was added to the already existing duty of a landowner vis à vis his invitee as is apparent from a reading of the emphasized portion of Section 343A:

"Known or Obvious Dangers

(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness.*" (Emphasis added)

When circumstances exist, therefore, which put the landowner on notice that the condition of danger is such that it cannot be encountered by the invitee with reasonable safety, even if the danger is known or obvious to him, under this added section, something more in the way of precaution or other conduct may be required of the landowner in his exercise of ordinary care. See: Harper and James, The Law of Torts, Volume 2, Sec. 27.13, pages 1489, et seq.; and Supplement to Volume 2, Sec. 27.13, pages 193, 4, Comment to Note 1 (wherein the original Restatement of Torts Sec. 343 was criticized, anticipating the adoption of

the expanded rule in new Sections 343 and 343A). Also, Prosser on Torts, Third Edition, page 404. Sec. 343A(1) was applied by the Missouri Supreme Court in Albers v. Gehlert, Mo.Sup., 409 S.W.2d 682. See also, Hanson v. Town & Country Shopping Center, Inc., 259 Iowa 542, 548, 144 N.W.2d 870. A brief and lucid discussion of the theoretical considerations involved in the application of that rule is found in Louisiana Law Review, Vol. XXVI, No. 3, pages 520, et seq. These principles and authorities are addressed to defendant's point that the judgment should stand because "plaintiff's evidence failed to make out a submissible case in his favor because the condition complained of was open and obvious and as well known to him as defendant". The infirmity of plaintiff's case we believe to be more fundamental. After having viewed all the evidence most favorably to plaintiff, and allowing him the benefit of all reasonable inferences which tend to support his theory of recovery, we have concluded that there was no substantial evidentiary support for plaintiff's submission of "an inadequately secured tar paper on the roof". Baker v. City of Festus, Mo.Sup., 418 S.W.2d 957.

Plaintiff's theory of recovery is contained in his verdict directing Instruction Number 4:

"Your verdict must be for the plaintiff if you believe:

First, there was an inadequately secured tar paper on the roof of defendant's house and as a result the roof was not reasonably safe for the plaintiff, and

Second, plaintiff did not know and by using ordinary care could not have known of this condition, and

Third, defendant knew or by using ordinary care could have known of this condition, and

Fourth, defendant failed to use ordinary care to secure it or warn of it, and

Fifth, as a direct result of such failure, plaintiff was injured, * * *."

We are not called upon to consider the fastidiousness of form or legal sufficiency of this instruction but shall refer only to those portions of it which may bear upon the issue of the sufficiency of the evidence. Plaintiff, in this instruction, posits as the basis of defendant's liability to him, "an inadequately secured tar paper on the roof" so that "the roof was not reasonably safe for plaintiff" and that defendant "failed to use ordinary care to secure it or warn of it".

Much of the trial testimony was concerned with describing the movements of the parties up and down the ladder, on the roof and in nailing down the toeboards. All this activity preceded plaintiff's fall and is largely irrelevant to the central issue of the inadequacy of securing the tar paper. As previously recounted, from his vantage point on the ground, plaintiff could see the roof and although he was not able to make out precisely the number of tacks or nails defendant had used in securing the tar paper, "(i)t was one every 18 inches, 20, 25 inches, something like that". Upon cross-examination, although his explanations of his observations were more involved, he concluded, not inconsistently, that defendant's scheme of nailing ultimately resulted in a two feet spacing between the nails. More significantly, plaintiff conceded the truth of the deposition account wherein he described the help he rendered his uncle in laying the tar paper either from a perch on the ladder or from a stance on the roof— the context of the colloquy is consistent with either conclusion. In any event, plaintiff admittedly observed the nailing regimen in its entirety. Defendant's version of this episode was somewhat different. He described plaintiff as positioned on a toeboard above the tar paper along the edge of the roof, unrolling the tar paper from above, while defendant, stationed on a ladder and scaffold-board, nailed the bottom edge of the paper. Defendant further testified that the nails at the top of the paper were spaced about two feet apart, and at the bottom, about six to eight inches apart. After plaintiff's fall, Fred Weber, his brother,

clambered up the ladder and inspected the "area from where the tar paper tore". The nails "were hammered down all of the way onto the tar paper". Upon cross-examination, he elaborated, " * * * they were hammered in hard and indented somewhat in the tar paper, the tar paper being fairly thick—maybe an eighth of an inch". Then again, "(t)he heads were I would say fairly flush to the tar paper". When asked: "So as far as you could tell then the nails had been hammered down all the way before Jack's accident?" He answered: "I suppose that would be right". Plaintiff's fall, itself, according to his view, came about when defendant requested him to come upon the roof once again in order to nail down a toeboard. Plaintiff himself also testified that he did not know if the number of nails in the tar paper were "enough to support me or anyone else", but later stated that at the time "he placed his foot on that tarpaper" he thought it was secure. According to plaintiff, his fall came about when defendant requested him to come upon the roof once again in order to nail down the third toeboard (although defendant had secured the other two uneventfully without help). He ascended the ladder, stepped onto the roof, attempting to reach beyond the three feet width of the paper, "and as I was pulling my other foot up off of the ladder, the tar paper broke loose and I fell". He succeeded in placing the toe of his foot on the plyboard so that only his heel was on the tar paper at the time it tore. Plaintiff's brother, on the other hand, and defendant both testified that plaintiff was standing with both feet upon the paper when it tore and plaintiff fell.

We have recounted all the testimony bearing directly or indirectly on the submitted ground of negligence. If, as plaintiff contends, the tar paper was inadequately secured, then we would ask, for what purpose was it secured at all? There was no evidence that the tar paper was intended as anything other than a rudimentary weather proof covering over which the shingles were to be spread as part of the permanent structure. Plaintiff, himself, ultimately acknowledged that the spacing of the nails in the paper was intended merely to keep the wind from blowing it away. It succeeded in that purpose. How many nails at what spacing constitute an "adequate securing" of tar paper nailed to a roof inclined at 40 degrees? The evidence does not indicate. The evidence did disclose that the tar paper or "felt", as it was sometimes called, had a thickness of about one-eighth of an inch. The size and other physical characteristics of the nails were not shown. Nothing in the evidence would allow the inference that either the paper or nails was unusually frangible or otherwise defective. The "inadequate securing", if referring to the workmanship alone, was without evidentiary support. The nails, by the testimony of plaintiff's brother and witness, were firmly implanted, and by plaintiff's own testimony, were spaced some two feet apart. The tearing of the paper, itself, is as consistent as not with the inference of adequate securing. Yet, " '(i)n order that negligence may be inferred from the circumstances, the evidence must be such as to exclude guesswork, speculation and conjecture. * * * And to remove the case from the realm of speculation the circumstances must be such that the party having the burden of proof has facts which give more than an equal basis for one of two or more inconsistent conclusions.' " Clymer v. Tennison, Mo.App., 384 S.W.2d 829 at page 834, quoting from Furber v. Kansas City Bolt & Nut Co., 185 Mo. 301, 84 S.W. 890. In the absence of substantial evidence as to "each and every fact essential to liability", the case may not be submitted. "Neither may any fact essential to submissibility be inferred in the absence of substantial evidentiary basis." Probst v. Seyer, Mo.Sup., 353 S.W.2d 798 at page 802, 91 A.L.R.2d 1252. By these standards, the jury could have found the essential fact of "inadequate securing" of the tar paper only as the result of speculation and guesswork and that is impermis-

sible. Chappel v. City of Springfield, Mo. Sup., 388 S.W.2d 886.

If, as we surmise, plaintiff intended to submit on the issue of defendant's negligence predicated on an inadequately secured tar paper *as to render the roof not reasonably safe for plaintiff when stepping or standing on it*, we can only add to what has already been said by observing that the evidence did not raise an inference to support that submission either. Nothing in the evidence permitted the inference that the tar paper, howsoever nailed, was intended to support a person weighing a minimum of 180 pounds, nor that plaintiff was asked or directed to stand upon it, nor a reasonable expectation by defendant that plaintiff would do so. Then, again, what constitutes an "adequate securing" of tar paper for the support of a human burden of that weight under the physical conditions described? Our conclusions based on a review of the evidence, just stated, suffice as an answer.

■ The cause of plaintiff's fall, in the legal sense, remains unexplained. The fact of the fall, not otherwise explained, does not entitle plaintiff to go to the jury or to recover from the owner on any theory of negligence. Fowler v. Terminal Railroad Assn. of St. Louis, Mo.App., 372 S.W.2d 497; Hildreth v. Key, Mo.App., 341 S.W. 2d 601; Clymer v. Tennison, supra. Our evaluation of the evidence can be best expressed by paraphrasing the comments of the court in Ostresh v. Illinois Terminal Railroad Company, Mo.Sup., 313 S.W.2d 19 at page 24. All of the evidence as to the cause of plaintiff's fall "is vague and at best does not present a situation from which liability of the defendant might be drawn with a greater degree of reasonable probability than defendant's nonliability. State ex rel. Trading Post Co. v. Shain, 342 Mo. 588, 116 S.W.2d 99, 102; Zimmerman v. Young, Mo.App., 280 S.W.2d 457, 461."

The judgment is affirmed.

All concur.